**STATE of Missouri, Respondent,**

v.

**Matthew MAYO, Appellant.**

**No. 37978.**

Missouri Court of Appeals,
St. Louis District,
Division Four.

Nov. 1, 1977.

William J. Shaw, Public Defender, Frank Anzalone, Asst. Public Defender, Clayton, for appellant.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Chief Counsel, Walter O. Theiss, Asst. Attys. Gen., Jefferson City, Courtney Goodman, Jr., Pros. Atty., Noel L. Robyn, Asst. Pros. Atty., Clayton, for respondent.

NORWIN D. HOUSER, Special Judge.

Matthew Mayo, convicted by a jury of manslaughter, § 559.140, RSMo 1969, and committed to the department of corrections for 7 years, has appealed.

From the state's evidence the jury could have found these facts: John Connors, while a visitor at Mayo's house, was wearing a pair of sunglasses for which he had paid $10. Mayo asked to see them. Connors took them off and handed them to Mayo. Mayo refused to return them to Connors and refused to pay Connors $3 for them, an amount Connors agreed to accept. Connors left Mayo's house, sought out Connor's cousin, Steven Trust, and told him Mayo had taken his sunglasses. Trust said, "We are going down there [to Mayo's] and get them." Connors, Trust and two Moody brothers drove to Mayo's. Connors, Trust and Tom Moody went up onto the porch of Mayo's house and Connors knocked on the door. Mayo answered the door, carrying a gun in his right hand, down at his side. Tom Moody left the porch and returned to the car parked in front of the house. Trust asked Mayo what the problem was. Connors said all he came for was his glasses. Mayo answered there was no problem. Mayo then "pulled the gun up," "put the gun up to [Trust's] head." When Trust saw the gun he said "F___ you" and started to turn, to go down the porch steps. The gun was fired. The bullet entered Trust's head just above the right eye, inflicting a wound from which he died several hours later. Mayo made an oral statement to Officer Duane France that Trust came to his house to collect money owed Trust for narcotics; that Mayo told Trust he did not have the money; that when Trust began threatening Mayo and Mayo's family with bodily harm Mayo shot Trust in self-defense. The officer found Trust lying on the ground at Mayo's house, with an automatic revolver in his waistband. Officer France testified that the weapon was not ready for firing; that there was no bullet in the chamber. He further testified that there were four cartridges in the clip; that to fire the gun you grab the top of the weapon, pull it back to put the bullet in the chamber, then pull the trigger. Officer France's *written report* stated that when the gun was examined there was a cartridge in the chamber. Officer Leslie DuBose testified that the gun removed from Trust's waistband was loaded—that there was a bullet in the chamber; that Mayo told DuBose that Trust had made numerous threats to harm him and his family and that he shot Trust in self-defense when Mayo saw Trust's hand go for his belt.

Mayo's mother testified she heard Connors threatening to go get his big brother and come back and kill "all of you black mother_____"; that later that evening Connors returned to her house with Trust and another man; that Trust had a gun in his bosom; that she called her son and told him "the fellow had a gun on him"; that she did not know whether her son had a gun or not; that she did not see her son with a gun.

Mayo's first point is that the court erred in giving Instruction No. 8 on justifiable homicide and refusing appellant's proffered instruction on the right to act upon appearances; that No. 8 was an incomplete statement of the law of self-defense in this case because it ignored one of his primary de-

fenses—his right to act reasonably in good faith.

Given Instruction No. 8 was MAI–CR 2.40, paragraph 2 of which reads:

" * * * (If) the defendant had reasonable cause to believe and did believe that he was in immediate danger of death or serious bodily harm and had reasonable cause to believe and did believe that it was necessary for him to act as he did to protect himself from such danger, then you are instructed that he acted in lawful self-defense and must be acquitted."

The court refused to give optional paragraph 5 of MAI–CR 2.40, which reads:

"If the defendant had reasonable cause to believe and did believe that he was in immediate danger of death or serious bodily harm and that it was necessary for him to act as he did, it is of no consequence that the appearances later turned out to be false. If he acted in lawful self-defense, as submitted in this instruction, he must be acquitted even though there was (no purpose on the part of [name of victim] to kill him or do him serious bodily harm) (and) (no immediate danger that it would be done) (and) (no actual necessity to use the force which he did)."

In refusing optional paragraph 5 the court reasoned that there was no evidence upon which Mayo could base an apprehension of death or great bodily harm that later turned out to be false. If the victim had brandished an unloaded cap pistol paragraph 5 would have to be given, the judge said, because the appearance of danger from a loaded pistol later turned out to be false, but here the appearance of danger from a loaded pistol did not turn out to be false.

Mayo argues that when Trust's hand went toward his belt he may have been intending merely to scratch his stomach, or pull a gun as a threat with no intention to harm Mayo, and that under a false appearances instruction Mayo would have been entitled to act "as long as he had a reasonable fear."

"The appearances doctrine operates to justify a person to act in self-defense although it later proves the appearances were false," *State v. Minnis*, 486 S.W.2d 280, 283[1] (Mo.1972), but optional paragraph 5 on appearances that later turn out to be false is to be given only in cases where it applies to the facts—where the evidence justifies it. *State v. Demaree*, 362 S.W.2d 500, 503[3] (Mo. banc 1962). The evidence does not justify the giving of an instruction on false appearances, because there were none. There was no appearance of any supposed danger other than that on which the given instructions were based. This is not a case of apprehending a danger which did not in fact exist. Instruction No. 8 does not ignore, deny or withdraw appellant's right to act on appearances. Under Instruction No. 8 appellant was entitled to act "as long as he had a reasonable fear." Under Instruction No. 8 if in truth Mayo was warned that Trust had a gun on him; if he saw Trust's hand go toward his belt; if he believed Trust was going after his gun to do him immediate harm; if he shot Mayo in fear and from a belief that it was necessary to do so to protect himself from immediate harm, and if his beliefs and fear were reasonable, then Mayo acted in lawful self-defense. The danger Mayo apprehended did not later turn out to be false. Under the evidence favorable to Mayo, Trust truly did have a gun; a very real, potentially lethal, loaded .45 automatic pistol, in his waistband.

Mayo further argues that the pistol was not in firing condition (based on Officer France's testimony that there was no cartridge in the chamber) and therefore the jury may have believed Trust did not present an immediate danger to Mayo. One officer testified there was a cartridge in the chamber; the other officer testified to the contrary, after making a written report that there was a cartridge in the chamber. A cartridge is transferred from clip to chamber by pulling the top part of the weapon back, which would take only an instant. Whether there was a cartridge in the chamber or not, the gun was in fact a deadly weapon, capable of being fired al-

most instantly. As both parties agree, there was no obligation on Mayo's part, prior to acting in self-defense, to inspect Trust's weapon to determine if in fact it was loaded and in firing condition. He was entitled to act upon reasonable appearances and reasonable beliefs. Instruction No. 8 gave him that entitlement.

Mayo's second point is that the court erred in not declaring a mistrial when Officer France testified that at one point during Mayo's interrogation at the police station Mayo refused to talk any further and refused to make a written statement; that this reflected on Mayo's constitutional right to remain silent, and tended to infer to the jury that his exercise of that right indicated a consciousness of guilt.

On direct examination the state's attorney elicited from Officer France in detail the facts surrounding Mayo's admissions that he shot Trust, including the times and places when and where Mayo made the statements; reading him his rights including the right to remain silent; circumstances showing that Mayo's statements at the police station were made voluntarily; the reason Trust came to appellant's house; the threats; the reason Mayo thought Trust had a gun; the movement of Trust's hand toward his belt; all the circumstances upon the basis of which Mayo claimed that he shot in self-defense; the exact words he used, etc. All of this came in without objection. On cross-examination of Officer France, Mayo's counsel covered much of the same territory relating to the oral statements made by Mayo both at the scene of the shooting and later at the police station. Finally *Mayo's counsel* asked Officer France whether he took a written statement from Mayo, to which the officer answered "No." The question "Why not?" was answered, "He didn't want to talk any more." *Mayo's counsel repeated* the question why Officer France didn't take a written statement and again the answer was, "He didn't want to talk any more."

■ Appellant's second point is without merit. The testimony now objected to was elicited not once but twice *by appellant's*

*own counsel* on cross-examination of the state's witness France in answer to questions asked by appellant's counsel. Appellant may not be heard to charge prejudice on account of testimony produced by appellant's own counsel. Any objection to the testimony of the police officer with respect to appellant's unwillingness to talk was waived. *State v. Cooksey,* 499 S.W.2d 485, 488[1, 2] (Mo.1973); *State v. Barron,* 465 S.W.2d 523, 526[1] (Mo.1971).

■ Mayo's third point raises the question whether the state proved that a specific victim died as a result of the criminal agency of the defendant, the claim being that there was no evidence that Mayo caused the death of Steven Trust. Dr. Eugene Tucker, deputy county medical examiner, examined the body of a person and testified as to the cause of that person's death, but Mayo claims Dr. Tucker did not indicate that the body he examined was that of Steven Trust; did not identify any photographs of Trust as pictures of the person he examined, and in referring to his autopsy report did not identify it as the report on the autopsy of Steven Trust.

The following circumstances and testimony sufficiently establish the identity of the victim as Steven Trust, prove his death and the cause of death: Officer John Easley, assigned to attend the autopsy of Steven Trust, took photographs marked State's Exhibits 10 through 15, with the exception of one photograph (Exhibit 13) in which Officer Easley appears. These photographs were taken at the morgue during the postmortem examination, which was conducted by Dr. Tucker. John Connors identified his cousin, Steven Trust, as the person portrayed in State's Exhibits 10, 11, 12 and 13. Dr. Tucker testified that one of the state's exhibits pictures him handing to a police officer a bullet which he had taken from the brain of the victim he examined, and that the cause of death was gunshot wound of the head. Officer Easley testified that that exhibit shows Dr. Tucker giving Officer Easley a bullet from the body of the

victim, which he earlier testified was Steven Trust.

Judgment affirmed.

SIMEONE, C. J., and ALDEN A. STOCKARD, Special Judge, concur.