STATE of Missouri, Respondent,

v.

Brad Ellis REYNOLDS, Appellant.

No. 38296.

Missouri Court of Appeals,
St. Louis District,
Division Four.

Dec. 13, 1977.

L. W. Boschert, St. Charles, for appellant.

John D. Ashcroft, Atty. Gen., Paul Robert Otto, Chief Counsel, Crim. Div., Michael H. Finkelstein, Asst. Attys. Gen., Jefferson City, James G. Gregory, Pros. Atty., Montgomery City, for respondent.

NORWIN D. HOUSER, Special Judge.

Brad Ellis Reynolds, found guilty of second degree burglary and stealing and sentenced to concurrent 2-year terms on each charge, has appealed. He contends (1) there was insufficient evidence upon which to base a conviction and (2) the trial court erroneously admitted in evidence acts and declarations of an alleged coconspirator implicating this appellant, without proof of a

conspiracy; that the coconspirator's alleged acts and statements were not made under oath, were not subject to cross-examination, and were made outside appellant's presence, all in contravention of the hearsay rule and appellant's constitutional right of confrontation.

(1) On the sufficiency of the evidence

██ Between 9:30 and 10 p. m. on April 17 Paul Angel discovered that a burglary had occurred at his barn located off Highway 19 two and a half miles south of Wellsville. Missing from the locked inner room inside the barn, which had been broken open, were two acetylene gas welding tanks and cart, a welder's mask, a gas welder, a tip of a torch, a tool chest, toolbox, a drawer of miscellaneous tools, a wheel and a motorcycle shield. A pickup truck, license number 7J3818, was parked in front of Angel's property. Angel drove to Wellsville, located sheriff deputies Covington and Whyte and reported the burglary. The officers accompanied Angel to the scene. The pickup truck was no longer parked in front of Angel's house when he and the officers returned. Search of the premises disclosed the missing tool chest, which had been removed from the barn, lifted over a fence between the barn and road, and abandoned near the fence. Angel could not lift the tool chest by his own efforts because it was too heavy. He and his grandson carried it back into the barn. A neighbor, driving past a point on the road one and a half miles west of Angel's farm at 6:10 on the morning of April 18, saw the welding tanks, cart and some of the missing tools lying in the ditch on the right side of the road. He picked up these items, put them in his pickup truck, informed Angel, and later turned them over to the sheriff's office. He had not observed these items as he passed there at 4:30 on the afternoon of April 17. At about 11:20 p. m. on April 17 Deputy Covington found the pickup truck, license number 7J3818, wrecked, standing in a fence row four and a half miles south of Montgomery City, headed toward that city on the road which led into the city on Pickering Street. The officers found Angel's tool-box, lying in a fence row at the scene of the wreck, ten to fifteen yards from the pickup. Deputy Sheriff Creech, notified that evening that the pickup truck had been located, started from Montgomery City traveling north toward the scene of the wreck. He drove to Route 161, turned north on Pickering Street, and there at about 11:30 p. m. he encountered appellant and Mike Rohmann, walking fast or trotting, proceeding south on Pickering. Interrogated, they said they had "lost" a truck and were searching for it. Deputy Creech picked them up and took them to the scene of the wreck. Appellant had a cut on his face, a small cut across the nose, a cut finger, and there was blood on his glasses and little patches of blood on his clothing. Appellant told Deputy Creech his face was bloody because he had a nosebleed. Rohmann was limping on one foot, and had cuts on the legs of his britches. At the sheriff's office on the morning of April 18, after having been given *Miranda* warnings, appellant told Deputy Covington that he had been with Rohmann the entire night of April 17, from 9:00 o'clock on. On that morning Deputy Creech had a discussion with Rohmann in which Rohmann related that he and appellant had been together all evening on April 17 between 9:00 o'clock p. m. and the time he and appellant were picked up by Deputy Creech. The officer told Rohmann he was interested in getting the property back and would like it if Rohmann would show Creech "where it was so that [they] could return the property" the owner had lost. After that conversation Deputy Creech and Rohmann drove first to the place of the accident, then to the scene of the burglary. Starting from the latter place, Deputy Creech and Rohmann drove over a route through various country roads described at the trial by the deputy. Finally Rohmann directed Creech to stop, saying "I think this is the place." He directed the officer to "back up." They stopped, got out of the police car, and there Rohmann found a wheel, a chisel and a tip of a torch (items missing from Angel's barn).

Mike Rohmann did not testify.

Appellant testified as follows: He and Rohmann were operating a borrowed pickup truck in Montgomery City about 9 p. m. on April 17. Appellant suggested to Rohmann, who was driving, that they go to Wellsville to check on some parts for his car. On the way and about 9:15 p. m., when they were still close to Wellsville, the truck "quit" because of electrical trouble. They walked to Wellsville to a filling station for help, passing the station at 10 o'clock p. m. Finding no one to help them, they walked back, intending to fix the truck themselves. The pickup truck was gone when they returned. They decided to walk the gravel roads in an effort to find the pickup truck. They did walk "quite a ways," finally reaching Montgomery City, where they saw Deputy Creech, who hailed them. They reporting missing a pickup truck. The officer said he had a call on a truck and invited them to go with him to see if it was their truck.

At trial appellant denied he had been in the pickup truck at the time it was wrecked. He said the cuts on his face, etc. were caused that afternoon when a jack handle flew off and hit him in the face; that his scratched knuckles resulted from "pulling the car (at Mr. and Mrs. Boyer's place) out there and trying to get the air in the tires and stuff like that." He accounted for Rohmann's limp by claiming Rohmann sprained his ankle in a physical education class at high school. He denied participation in the burglary. He admitted that three weeks before the burglary he and Rohmann had been at the Angel farm "to see about a pickup truck." On that occasion he saw other motor vehicles there. Appellant's father operates a body shop. Appellant does body work; works on automobiles. He testified that cutting torches and tools are used in body work.

There is sufficient circumstantial evidence for a jury to find that appellant, acting in concert with Mike Rohmann, being interested in automobiles, automobile parts, and tools and appliances useful in appellant's work of automobile body work, and having knowledge from a previous visit that such things were kept at the Angel farm, borrowed a truck and went to Angel's at a time when Angel was not at home, broke into the inner room of the barn, removed the lighter, smaller items described and placed them in the pickup truck, removed a portable air tank from the inner room in the barn and deposited it in the hallway of the shed, ready to be carried later to the truck; that the tool chest, too heavy for one person to lift, was carried by both appellant and Rohmann from the barn and lifted over the fence, on the way to the truck; that they were interrupted by the return of Paul Angel; that they abandoned the tool chest, leaving it near the fence; that after Angel went to report the burglary appellant and Rohmann left the scene, drove the pickup truck to a point a mile and a half west of the farm, where they discarded the tank cart and other items, throwing them beside the road; that they proceeded on in haste, overturning as they rounded a curve; that other articles belonging to Angel, later found near the wrecked truck, were thrown out of the truck; that in the course of the wreck they sustained the personal injuries observed by the officers later that evening; that the wreck occurred somewhere between 10 and 10:30 p. m., four and a half miles from Montgomery City; that notwithstanding their injuries they could walk; that after the wreck the two walked to Montgomery City; that in their condition it took them slightly more than an hour to walk that distance; that they encountered Deputy Creech at about 11:30 p. m.; that the average walking speed of a person is 4 or 5 miles per hour.

Appellant's testimony raises unresolved doubts. Appellant testified that the borrowed truck "quit" due to mechanical trouble; that he and Rohmann tried unsuccessfully to fix the trouble, and that he and Rohmann walked to Wellsville, where they went to a filling station seeking assistance, at about 10 p. m. Appellant's testimony does not jibe with Angel's testimony that as Angel traversed that same road, both going to and coming from reporting the burglary to the authorities, Angel saw no one on the road. Unexplained is the failure of the

officers, who were at and about the filling station at 10 p. m., to see or encounter appellant and his companion. Appellant testified that when he and Rohmann failed to get help at the filling station they returned to the place where they had left the truck, but it was no longer there. Unexplained is how an inoperable truck was able to move from the place where they had left it parked, to the place where it was found in a wrecked condition. Appellant testified that upon discovery that the truck was missing the two men started walking around through the countryside looking for the truck. Unexplained is why they did not report to the authorities that the truck was missing, instead of making an unnatural, unusual nocturnal search on foot. Appellant was with Rohmann all evening. They were operating this truck together. The evidence is overwhelming that the stolen goods were carried away from Angel's place in the pickup truck being operated that evening by appellant and Rohmann. Some of the stolen items were recovered in the immediate vicinity of the truck. Unexplained is how those stolen items got there if not through the agency of appellant and his companion.

The circumstances proved by the State are consistent with each other and inconsistent with any reasonable theory of appellant's innocence. There was sufficient evidence from which the jury could find that appellant, acting in concert with Rohmann, knowingly and with a common purpose, burglarized the inner shed in Angel's barn and stole the articles in question.

### (2) Inadmissible acts or declarations of coconspirator?

The testimony objected to at trial and which forms the basis of appellant's second point is the testimony of Deputy Creech (a) that on the morning of April 18 he had a discussion with Rohmann in which Rohmann told him that he and appellant had been together all evening, and (b) that responding to his request that Rohmann show where the (stolen) property was, Rohmann accompanied the officer to the spot where several of the stolen items were found. The objection at trial was that this called for hearsay testimony, was irrelevant and immaterial, and that there had been no showing of a conspiracy.

(a) With respect to the testimony of the officer that Rohmann stated upon inquiry that he and appellant had been together all evening: Appellant is in no position to complain about the admission of this obviously hearsay testimony, because appellant himself took the stand and on direct examination testified freely concerning his whereabouts and peregrinations during the evening in question, from beginning to end, in great detail, in the course of which appellant demonstrated that at all of the times and places mentioned and continuously he and Rohmann were together. On cross-examination appellant testified as follows: "Q You were with Mike Rohmann from approximately 8:00 o'clock p. m. on the night of April 17, 1975 until you were stopped by Mr. Creech, is that correct? A Yes, sir. Q Mr. Rohmann was not out of your sight during that time? A No, sir." In view of appellant's own direct testimony as to this fact appellant could not have been prejudiced by hearsay evidence of the fact. "Appellant may not be heard to charge prejudice on account of testimony produced by appellant's own counsel." *State v. Mayo*, 559 S.W.2d 264 (Mo.App.1977).

Appellant argues, however, that there is no evidence that appellant knew Rohmann's intention to commit a burglary that night and no proof that appellant planned, participated or "had anything to do with the alleged crime"; that mere presence is insufficient to establish a conspiracy. There is more than mere presence. There is strong circumstantial evidence that the heavy tool chest was carried from the barn to and over the fence, a feat which under the evidence required the joint act of two people and could not have been accomplished by one person acting alone. From this evidence, taken in conjunction with the other facts and circumstances shown, the jury could infer appellant's connection with the burglary and stealing.

■ (b) With respect to Rohmann's acts and declarations leading the officer to three items stolen from Angel's barn, appellant seeks to invoke the following rule: "Generally it is said that after the common enterprise is ended, whether by accomplishment or abandonment, no one of the conspirators or joint actors is permitted by any subsequent act or declaration of his own to affect the others." *State v. Chernick*, 280 S.W.2d 56, 59–60 (Mo.1955). The rule has its exceptions. For instance, it may be shown that any one of the coconspirators was in possession of the fruits of the crime, or the weapon or instrument with which the crime was committed. *State v. Tripp*, 303 S.W.2d 627, 632[6] (Mo.1957); *State v. Costello*, 252 S.W. 727 (Mo.1923). An illustrative case is *Catching v. State*, 364 S.W.2d 691 (Tex.Cr. App.1962), an abortion case in which, over appellant's objection, the state was permitted to show that the day after the alleged abortion the officers went to the garbage dump in Texas City and, acting upon instructions given by one Forehand, a coconspirator, there they found the fetus of a male child in a plastic sack wrapped in plastic. After stating the exception in cases involving the possession of the fruits of the crime, or the weapon or instrument used, the court said, 364 S.W.2d l. c. 695: "The fact that Forehand assisted the officers in finding the fetus did not render evidence of such discovery inadmissible. The finding of the fetus did not tend to criminate the appellant, * * *." Fully applicable here is the exception in burglary cases rendering admissible declarations and acts of one of the coconspirators leading to a finding of the property claimed to have been stolen. 22A C.J.S. Criminal Law § 767 e., p. 1151. In this connection we endorse what the court said in *Sims v. State*, 95 Tex.Cr.R. 164, 253 S.W. 278 (1922), a burglary case, wherein one Vickers, an accomplice of appellant, after being jailed, went with three officers to certain places where the stolen goods were found, as applicable to the case before us. Over objection Vickers and the officers were permitted to testify that Vickers went with the officers and directed them where to go, and that they found the stolen property. In ruling the testimony admissible the court said, 253 S.W. l. c. 281–282: "It could hardly be claimed that the declarations or acts of one coconspirator in revealing to the officers the whereabouts of stolen property were in pursuance of the common design actuating him and his fellows in the commission of the theft or burglary by which said property was acquired. Such acts or declarations could not have for their purpose the furtherance of a common design, but would seem to be in derogation thereof. The admissibility of the testimony under consideration does not seem referable to the above rule. What was done by the officers in searching for and recovering the stolen property is admissible in the development of the case. We see no sort of distinction between testimony of the acts of others in this regard and that of the acts of Vickers. * * * In *Funk v. State*, 84 Tex.Cr.R. 402, 208 S.W. 509, it is made to appear that an officer testified that he went with two participants in the alleged crime and under their direction to a certain culvert, where he found certain pistols and cartridges which were identified at the trial as those used in the homicide. This testimony was held admissible. * * * Bearing in mind that Vickers was with the officers all the time during the search for and recovery of the stolen property, their statements that Vickers showed them, or that he directed them, were not necessarily a relation of anything said by Vickers, nor does anything appear in the testimony relative to the search for and recovery of the property which by any course of reasoning or from any standpoint can be taken to more than properly develop the transaction. It does no more than develop the crime, and does not point to the defendant as a guilty participant therein, and can in no sense be said to be injurious to him. * * * The objection to the testimony of Vickers to the fact that he went with the officers and directed them, or that he said he told them where to go, has no force, in view of the fact that Vickers was with the officers in all of their search, and his testimony on this point contains a narration of no fact aiding or lend-

ing force to the proposition of the guilty connection of the accused with said property."

Cases cited by appellant, of which *State v. Newell*, 462 S.W.2d 794 (Mo.1971), is illustrative, are inapposite. In *Newell* the coparticipant's statements and declarations demonstrated clearly that the accused was guilty of the crime alleged; they were "crucial and devastating," and the jury may have inferred that the statements were not only made but also that they were true. In contrast, nothing Rohmann is related to have said or done on the morning of April 18 named appellant, connected appellant with the crime, or criminated him individually. Appellant was not prejudiced by this testimony.

Appellant makes the further contention that he was deprived of an opportunity to cross-examine Rohmann by the failure of the State to endorse Rohmann's name on the information and to subpoena or produce him in court as a witness. Appellant had an equal opportunity, but he made no effort to avail himself of Rohmann's testimony. Perhaps the reason neither side called Rohmann as a witness is to be found in the statement of counsel for appellant in open court during a posttrial hearing: " * * * I was informed by [Rohmann's] attorney that he would take the Fifth Amendment on all questions * * *." In any event, there is no obligation on the part of the state to produce any particular witness.

No error appearing, the judgment of conviction is affirmed.

SIMEONE C. J., and ALDEN A. STOCKARD, Special Judge, concur.