STATE of Missouri, Plaintiff-Respondent,

v.

Lawrence Gene TIMMONS, Defendant-Appellant.

No. 10505.

Missouri Court of Appeals, Springfield District, Division I.

Dec. 14, 1978.

John D. Ashcroft, Atty. Gen., Stanley Robinson, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

William H. Wendt, Springfield, for defendant-appellant.

TITUS, Judge.

A Greene County jury found defendant guilty of the felonies of kidnapping (§ 559.-240, V.A.M.S.) and assault with intent to do great bodily harm without malice aforethought (§ 559.190, V.A.M.S.), and fixed punishment for the kidnapping at three years' imprisonment and for the assault at four years' imprisonment. After due post-trial proceedings, defendant appealed.

As convictions have resulted on both counts of the information, our recasting of the evidence, infra, is done with deference to the appellate rule that the evidence, whether direct or circumstantial, must be reviewed and the reasonable inferences to be drawn therefrom must be considered in the light most favorable to the state, and all inferences and evidence to the contrary must be disregarded. *State v. McIntosh*, 559 S.W.2d 606, 607[1] (Mo.App.1977).

The crimes were committed near 6:30 p. m. at 917 E. Normal, Springfield,

Missouri, on Wednesday, May 19, 1976, and within the period prescribed for observance of daylight saving time. 15 U.S.C.A. § 260a. As the time of sunset is judicially known [*Phillips v. Stockman*, 351 S.W.2d 464, 467[1] (Mo.App.1961)], we note that on the day in question the sun set at 8:18 p. m. (Sunrise and Sunset Table No. 1166, prepared by Nautical Almanac Office, U.S. Naval Observatory, Washington, D.C.) or about two hours after the commission of the crimes.

On the day of the offenses, the two-story house with partial basement, supra, was occupied by four young male cotenants, including defendant. Defendant's belongings were kept on the first floor in what was referred to as John Gage's old bedroom and in a closet off the living room. At various times during his short occupancy of the premises, defendant slept on the first floor either in Gage's old room or on a living room couch, or in the basement on a mattress and box spring located on the concrete floor. Apparently all occupants of the house had equal access to the basement when necessary or desired.

The victim of the concerned crimes is a boy named Chris. He was 11 years old at the time of perpetration. His astuteness and qualifications as a competent witness were never challenged. On the involved evening and following an early repast at home, Chris went to a lawnmowing job at 901 E. Normal. He was shod in sneakers and carried a screwdriver in his blue jeans which was employed in starting the lawn mower. Shortly after arrival on the job, Chris was joined by his older brother, Bucky, who took over the mowing and told Chris to seek other lawns to mow. Chris departed on a bicycle which Bucky had ridden to the job-site.

Upon arriving in front of 917 E. Normal, Chris left the bicycle at the curb and went to the screened-in front porch of the house. He saw a man lying on a couch on the porch and inquired about mowing the lawn. Chris and the man conversed about a minute and a half through the screening before the man, after admitting Chris inside and

onto the porch, went into the house for the avowed purpose of asking his "wife" about having the lawn mowed. Shortly thereafter the man returned to where Chris awaited. He was armed with a shotgun which he employed in forcing Chris into the basement of the house. After arriving in the basement, the man pushed Chris onto the above-mentioned bed, put a white cloth sack over his head and bound his hands. Thereafter, the man plucked Chris from the bed by a leg and an arm and submerged the boy's head into water confined in a container.

[An aside: Chris later described his assailant as being a white male, about 20 to 22 years old, approximately 5 feet 10 inches to six feet tall, weighing 160–170 pounds, having brown hair and either a scar "or some type of pigment in his skin" under his left eye. At trial the 22-year-old white male defendant described himself as being six feet tall, weighing 165 pounds, and having brown hair and blue eyes. Defendant acknowledged he had a birthmark under his left eye which was about one-half inch long.]

While or near the time the man was submerging Chris' head in the water, two women (one of whom was a sister of a tenant) arrived at 917 E. Normal and saw a bicycle lying over the curbing in front of the house. When there was no response to their door knockings, the women opened the unlocked front door and called but no one responded. Upon entering the living or front room, one of the women saw through a hole in the floor a light that was burning in the basement. About that time the light was extinguished and the woman heard a breaking noise of "[s]ome type of glass." Following this, the woman went to the basement door in the kitchen and "I called down, and no one answered and I went back in the front room." About three to five minutes later, defendant came from the kitchen into the living room where the two women were sitting. Defendant was wearing "double knit dress pants [and] a white T–shirt [which] was fairly damp." It was observed that the palm of defendant's

right hand had been recently cut and defendant told the woman this had occurred while he was cleaning his room in the basement. At trial defendant admitted to having been in the basement when the women entered the house. However, he denied Chris was in the basement at any time he was there or that he had participated in any of the basement conduct recited by Chris.

Shortly after the arrival of the two women at the house and defendant's emergence from the basement, the trio left on a shopping venture. Upon returning, they were soon joined or replaced in the house by other residents and guests. Near 7:30 p. m. Bucky was looking for Chris when he came upon the bicycle lying on the curbing in front of 917 E. Normal. Bucky rode the bicycle home. After freeing himself from his bonds and hiding in the basement while other occupants roamed the premises, Chris managed to escape the house via a basement window leaving behind his screwdriver and one sneaker. When Chris arrived home around 8:30 p. m. with his clothing wet, his arms and face muddy and looking very upset, he recounted the details of his experience. Shortly thereafter he repeated his recountings to the police.

About 9:45 p. m. Chris, together with his father, brother Bucky and two policemen, returned to 917 E. Normal. Leaving the others outside, the policemen approached the house and knocked on the front door. Someone inside yelled something and, via the glass in the door, the police saw the house occupants start to scatter. The two policemen entered the house believing a crime had been committed therein with the intent of arresting the criminal if he was present. One officer went upstairs. The other descended to the basement and upon arrival realized he was at the scene of the crimes. While in the basement, the officer saw in plain view and took possession of a shotgun (later identified as belonging to defendant) and the sneaker that Chris had lost.

Upon returning to the first floor, the officers encountered the two women previously mentioned and two men. One of the men was the former tenant, John Gage. After Chris, his father and brother were called into the house, Chris was asked if he could identify his abductor and assaulter. The testimony at trial varied as to whether Chris did or did not make a tentative identification of Gage. But whether Chris did, in fact, at first identify or suggest that Gage was the perpetrator, it was agreed among those who said Chris initially identified Gage, that Chris shortly recanted. Gage was not thereafter considered a suspect. Later that night the police were advised that defendant had returned to 917 E. Normal and wanted to consult with the authorities concerning the matter. Upon arrival at the address and after viewing defendant who matched Chris' description of his kidnapper and assailant, defendant was arrested and incarcerated. At this time and on immediate subsequent dates with permission of the various cotenants of the premises, the police discovered and acquired in the house basement a watercooler partially filled with water, Chris' screwdriver, binding twine and a wet, soiled cloth bag stamped with defendant's name.

At trial, defendant acknowledged that following his arrest and incarceration, he voluntarily signed documents entitled "Waiver of Right to Remain Silent and of Right to Advice of Counsel" and "Line-up Waiver Face to Face Confrontation."

On the day following the crimes, Chris went to the police station to view a man in a showup[1] to determine if he could be identified as the kidnapper and assailant. Chris overheard a detective tell his father that the man to be viewed was a resident of 917 E. Normal but he was not told the man was a suspect and he did not know beforehand whether or not the man was the guilty person. Following the confrontation, Chris told the police that defendant was the man

1. Although "showup" and "lineup" are sometimes used interchangeably, more properly the term "showup" alludes to a situation where one suspect is shown by himself to a witness or witnesses, whereas in a "lineup" an array of persons, including a suspect, is presented to a witness or witnesses. *State v. Johnson*, 538 S.W.2d 73, 75[1], note 2 (Mo.App.1976).

and at trial testified: "Q. Chris is there any doubt in your mind at all, that [defendant] is the man that attacked you that night? A. No."

▪ *Defendant's First Point Relied On*: "The court erred in failing to sustain [defendant's] motion to suppress the in-court identification by witness Chris . . . for the reason that the one-on-one confrontation or show-up of [defendant] . . . was so unnecessarily suggestive and conducive to irreparable mistaken identity as to be violative of due process, especially in view of the fact that the witness was an eleven-year-old boy and more susceptible to the suggestive situation created by adults."

The mere fact that defendant was in the custody of the police did not constitute the showup, agreed to by defendant, " 'unnecessarily suggestive and conducive to irreparable mistaken [identity].' " *State v. Maxwell*, 502 S.W.2d 382, 389[7] (Mo.App.1973). "In evaluating the suggestiveness of a particular confrontation and the likelihood of misidentification, we look to factors such as the opportunity of the witness to view the accused at the time of the alleged crime, the accuracy of the witness's prior description of the accused, the certainty of the witness at confrontation, the length of time between the crime and the confrontation, and the need for police to determine at the earliest opportunity whether the person suspected is in fact the person sought." *State v. Hudson*, 508 S.W.2d 707, 710[7] (Mo.App. 1974), and cases there cited.

Chris' observations of the defendant while talking with him on the porch and after being admitted inside, though of relatively short duration, were sufficient to enable him to give the investigating police officers a remarkable and accurate description of the defendant prior to confrontation. The confrontation at the police station occurred within a short time of the initial observations by Chris of defendant. Despite Chris' alleged initial misidentification of Gage, if so, he quickly recalled the mistake, if any, and was certain of defendant's identification at the time of confrontation at the police station. Additionally, Chris'

in-court identification of the defendant had sources independent of the confrontation at police headquarters. Such independent sources are sufficient to overcome claims of unnecessary suggestiveness. *State v. Jackson*, 477 S.W.2d 47, 51[4] (Mo.1972). Defendant's urgings on appeal that Chris' identification of him was questionable because he asserted defendant was wearing blue jeans at the time of the crimes, whereas the witnesses said he was clad in plaid dress slacks when seen the evening of the events, and had failed to notice defendant's arm tattoos, were matters to be considered and resolved by the jury. We rule that the trial court properly overruled defendant's motion to suppress the identification testimony and properly admitted Chris' subsequent in-court-identification recountings. *State v. Burnette*, 549 S.W.2d 352, 353[2, 3] (Mo.App.1977).

*Defendant's Second Point Relied On:* This prolixiously written point, in essence, claims that the trial court erred in failing to suppress the evidence taken from and the photographs taken of the house where the crimes were committed because no search warrants had been obtained and, as a result thereof, defendant's various constitutional rights had been violated.

▪ As regards the complained of searches and photographing after the first entry into and search of the house by the officers, it suffices to note that all such searches and photographing were consented to by defendant's cotenants who possessed equal access to and control over the premises. A cotenant may give permission to search shared property [*State v. Sutton*, 454 S.W.2d 481, 484[2] (Mo.1970); *Parton v. State*, 545 S.W.2d 338, 341[10] (Mo.App. 1976)] and evidence disclosed by reason of such a search may be used against any such cotenant. *United States v. Twiford*, 315 F.Supp. 801, 803[2] (W.D.Mo.1970).

▪ We agree with the state that neither the initial entry into the house without a warrant to search for the suspected felon, nor the search thereof without a warrant was invalid. Under the circumstances of this

case "the exigencies of the situation made that course imperative." *McDonald v. United States*, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948).

A number of considerations have been used in qualifying "exigent circumstances" or "urgent need" to meet the ultimate test of avoiding as "unreasonable" warrantless searches. Among the factors of the test are: "First, that a grave offense is involved, particularly one that is a crime of violence. . . . Second, . . . that the suspect is reasonably believed to be armed. . . . Third, that there exists not merely the minimum of probable cause, . . . but beyond that a clear showing of probable cause, including 'reasonably trustworthy information', to believe that the suspect committed the crime involved. Fourth, strong reason to believe that the suspect is in the premises being entered. Fifth, a likelihood that the suspect will escape if not swiftly apprehended. Sixth, the circumstance that the entry, though not consented, is made peaceably." *Dorman v. United States*, 140 U.S.App.D.C. 313, 321, 435 F.2d 385, 392–393[11] (1970), and cases there cited.

We see no basis for disturbing the obvious judgment of the trial court that the instant case presented the type of exigent circumstances and urgent need that justified an entry at 917 E. Normal without the delay incident to a warrant. No doubt exists but that grave offenses involving violence to an 11-year-old boy were involved which entailed the use of a weapon with which the suspect could still have been armed. The officers, combining Chris' recountings, his brother's sightings of the bicycle and their own observance of the premises before entering, had reasonably trustworthy information that the suspect was an occupant of the property and was probably in the structure. There was at least a likelihood that a delay might permit escape, when and if the suspect came to realize that Chris had become free of his bonds and left the house. Albeit the police possessed no special knowledge that the suspect was home at the time of entry, the concepts of probable cause and reasonableness prima facie justified looking for a man at his home about 9:45 p. m.

In our view, the sneaker and shotgun found and seized by the officer in the basement on the first occasion were not the result of a search. Upon entering the house the police were not looking for things but for a person. The officers had a right, as above seen, to seek through the house in search of the suspect who could present a security risk, interfere with arrest or escape. Discovery of the shotgun and sneaker was simply incidental to a search of the house for the reported suspect. The items found in the basement fell within the plain view of the officer who had the right to seize them for their introduction into evidence. *Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *United States v. Briddle*, 436 F.2d 4, 7 (8th Cir. 1970), cert. denied 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 824 (1971); *State v. Reask*, 409 S.W.2d 76, 83[6] (Mo.1966); *State v. Vineyard*, 497 S.W.2d 821, 826[8, 9] (Mo.App.1973).

*Defendant's Third Point Relied On:* "The court erred in overruling appellant's motion for judgment of acquittal at the close of the state's case-in-chief and at the close of all the evidence for the reason that there was insufficient circumstantial evidence to sustain a judgment of conviction, especially in view of the uncertain testimony of Chris . . ., and the lack of any other evidence linking appellant to the crime."

The first thing wrong with the point relied on, is that any error the trial court may have committed in failing to sustain defendant's motion for judgment of acquittal (Rule 26.10, V.A.M.R.) at the close of the state's case, was waived when defendant introduced evidence in his own behalf. *State v. Lewis*, 526 S.W.2d 49, 52[1] (Mo.App.1975). The second thing wrong with the point is that Criminal Rule 28.18, V.A.M.R., requires that Civil Rule 84.04(d), V.A.M.R., be complied with in appeals in criminal cases, and the bald assertion that there was insufficient circumstantial evidence to sustain a conviction, does not sate

the requirements of the latter rule because it does not state wherein and why the evidence is claimed to be insufficient. *State v. Robinson,* 555 S.W.2d 667, 669[1] (Mo.App. 1977); *State v. Brown,* 554 S.W.2d 574, 580[15] (Mo.App.1977).

■ *Defendant's Fourth Point Relied On:* We deem it unnecessary to iterate the point which complains that the trial court erred in giving instruction number 7 because the point is not preserved for appellate review as, contrary to Rule 84.04(e), V.A.M.R., the instruction is not set forth in the argument portion of defendant's brief. *State v. Crowell,* 560 S.W.2d 889, 890[2] (Mo.App.1978); *State v. Stuebinger,* 552 S.W.2d 338, 339[3] (Mo.App.1977); *State v. Rantz,* 546 S.W.2d 200, 201[1] (Mo.App.1977).

Judgment affirmed.

FLANIGAN, P. J., STONE, J., and CAMPBELL, PYLE, MOORE and KENNEDY, Special Judges, concur.