**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Lula Margaret BUTLER,
Defendant-Appellant.**

No. 65700.

Supreme Court of Missouri,
En Banc.

Sept. 11, 1984.

Douglas K. Crandall, Vernie R. Crandall, William C. Crawford, Carthage, for defendant-appellant.

John Ashcroft, Atty. Gen., George (Chip) Cox, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

GUNN, Judge.

Defendant appeals her conviction for the second degree murder of her husband. A sharply divided Southern District of the Missouri Court of Appeals affirmed the judgment, but the cause was transferred to this Court on certification pursuant to Rule 83.01. We consider the matter as an original appeal. Mo. Const. art. V, § 10.

The issues raised on appeal relate to certain evidence seized from the victim's house without a search warrant, denial of a continuance sought on the basis of pretrial publicity generated by the "Hinckley" decision, and the trial court's refusal of defendant's mental state of mind instruction.

We find no reversible error and affirm the judgment.

Shortly after midnight on a cold March night, the dispatcher at the Jasper County sheriff's office received a telephone call from a man identifying himself as Stanley Butler. Mr. Butler related that he had been shot by his wife in their home in Sarcoxie. After answering a few questions, Mr. Butler laid the telephone down, and the dispatcher sent an ambulance and law enforcement officials to the Butler home. On their arrival a few minutes later, sheriff's deputies noticed defendant in the outside yard in her bare feet, clad only in a nightgown. The officers attempted to enter the home but found the entryway door locked. Looking inside through a window, they saw Mr. Butler lying on the floor of the family room. When Mr. Butler noticed the police officials outside, he reached

up and unlocked the door to allow their entry. He then fell back and died shortly thereafter, the cause of death being a single .22 caliber bullet wound to the stomach.

Almost immediately upon their entry, police noticed and seized a .22 caliber rifle lying on the floor near the victim and which turned out to be the weapon used to kill Mr. Butler.

Defendant was placed under arrest for investigation of felonious assault. Given the *Miranda* warnings, she refused to make a statement. When later quizzed by the city marshal, the defendant did relate that she had shot her husband in the bedroom that was about 34 feet away in an opposite part of the house from the family room in which the victim was found. This bit of information led investigators to the bedroom and a view of the bed. The investigators immediately noticed a bullet hole visible on the bedspread. When the bedspread was taken for evidence, the investigators also noticed a bullet hole in two pieces of underlying bedclothing. These items were also seized.

Defendant's testimony at trial was that the marriage relationship between her and her husband of nearly 36 years had deteriorated within the last year and few months. She related that he had quarreled vigorously with her from time to time and had on occasion physically abused her.

The evening of the killing, defendant had received a house call from a lady friend. After the friend had left, defendant loaded the .22 caliber rifle and placed it in the bedroom closet. When her husband came home, the two ate a light meal and went to bed. Later, she awakened her husband to talk to him and he became truculent. She testified that he came across the bed at her, so she jumped from the bed, reached in the closet and grabbed the gun. She testified that when she pointed the weapon at him that it accidentally discharged. He then took the gun from her and chased her out of the house where she remained until police officials arrived.

The trial court sustained defendant's motion to suppress statements made to the city marshal after the *Miranda* warnings had been given. Motions were filed to suppress the bedclothing articles on the grounds that they were secured without a search warrant and by her disclosure that the shooting took place in the bedroom through police interrogation after she had invoked her *Miranda* rights. The motions were overruled. This latter evidence is, of course, clearly devastating to the defendant's theory of the case that the victim was more or less coming at her when she reached into the closet for the gun she had loaded earlier in the evening.

## I.

Defendant contends error in the trial court's failure to suppress the evidence of the bedclothing, as it was obtained during a search of her home by law enforcement officers without a warrant and without her consent in violation of her rights pursuant to the fourth amendment to the Constitution of the United States and Mo. Const. art. I, § 15. Defendant states that under the circumstances none of the exceptions for obtaining a warrant recognized by courts of law applies so as to permit such a warrantless search.

■ The fourth amendment to the United States Constitution guarantees protection from unreasonable searches and seizures and provides that no warrant shall issue unless probable cause so exists. However, if exigent circumstances exist, a warrantless entry of a home is permissible to search in emergency situations in response to a need for help. *State v. Epperson*, 571 S.W.2d 260 (Mo. banc 1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979); *State v. Miller*, 486 S.W.2d 435 (Mo.1972).

■ The warrantless entry into the Butler residence can be justified by the emergency telephone call of the victim that he had just been shot by his wife in their home. The officers' entry into the home was made as a medical emergency to aid the wounded caller, especially after they saw him lying on the floor. The entry was

also fully justified despite the absence of a warrant, as the victim, a co-tenant of the house, opened the locked door for the police to enter. Consent by a co-tenant of shared property obviates the need for a search warrant to enter the premises. *State v. Timmons*, 574 S.W.2d 950, 954 (Mo.App. 1978). Therefore, the officers gained lawful entry into the Butler home.

Defendant argues, however, that a search was made after the emergency passed and was an unlawful intrusion into her rights. This is based on the fact that at the time the police went into the bedroom and took the bedclothing, the victim was out of the house and was enroute to the hospital, the defendant was under arrest, and it had been ascertained that no other persons were in the house. Hence, so argues defendant, the emergency had ceased and a warrant was required for entry into the bedroom to seize the bedclothes which disclosed the bullet hole to the plain viewing of anyone in the room.

There are at least three legitimate bases for finding the admission of the bedclothes to be proper: the inevitable discovery of the evidence, the existence of exigent circumstances, and implied consent of the victim to the search.

### A. Inevitable Discovery

■ *Nix v. Williams*, — U.S. ——, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), gives United States Supreme Court cachet to the inevitable discovery doctrine, which allows illegally obtained evidence to be admitted if it would have inevitably been discovered by lawful means.

The inevitable discovery doctrine is not newly come. This exception to the exclusionary rule has been recognized and accepted by a substantial number of courts, including, as noted in *Nix v. Williams*, every federal Court of Appeals having criminal matter jurisdiction. The Eighth Circuit gives full treatment to the doctrine in *United States v. Apker*, 705 F.2d 293, 306–07 (8th Cir.1983), *aff'd in part*, *United States v. Fitzgerald*, 724 F.2d 633 (8th Cir. 1983), *cert. denied*, — U.S. ——, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984).[1] *State v. Byrne*, 595 S.W.2d 301 (Mo.App.1979), *cert. denied*, 449 U.S. 951, 101 S.Ct. 355, 66 L.Ed.2d 215 (1980), is Missouri's initial recognition of the inevitable discovery doctrine.

*Apker* is particularly appropriate to the circumstances of this case, although the facts here provide even stronger footing for the application of inevitable discovery. In *Apker*, pursuant to invalid search warrants,[2] state and federal agents searched defendants' residences and found and seized guns used for ultimate convictions for violation of federal firearms laws. Finding that valid state search warrants could or would have been obtained, the Eighth Circuit upheld the admissibility of the firearms seized pursuant to illegal search warrants, "because it was inevitable that the guns would have been discovered during the execution of the valid state search warrants." *Id.* at 309–10. "[T]he illegal warrant clearly did no more than hasten the discovery of the guns." *Id.* at 307.

The rationale for the existence and imposition of the inevitable discovery doctrine is

---

1. *See Wayne v. United States*, 115 U.S.App.D.C. 234, 238, 318 F.2d 205, 209, *cert. denied*, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963); *United States v. Bienvenue*, 632 F.2d 910, 914 (CA1 1980); *United States v. Fisher*, 700 F.2d 780, 784 (CA2 1983); *Government of Virgin Islands v. Gereau*, 502 F.2d 914, 927–28 (CA3 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *United States v. Seohnlein*, 423 F.2d 1051, 1053 (CA4), *cert. denied*, 399 U.S. 913, 90 S.Ct. 2215, 26 L.Ed.2d 570 (1970); *United States v. Brookins*, 614 F.2d 1037, 1042, 1044 (CA5 1980); *Papp v. Jago*, 656 F.2d 221, 222 (CA6 1981); *United States ex rel. Owens v.*

*Twomey*, 508 F.2d 858, 865–66 (CA7 1974); *United States v. Apker*, 705 F.2d 293, 306–07 (CA8 1983); *United States v. Schmidt*, 573 F.2d 1057, 1065–66, n. 9 (CA9), *cert. denied*, 439 U.S. 881, 99 S.Ct. 221, 58 L.Ed.2d 194 (1978); *United States v. Romero*, 692 F.2d 699, 704 (CA10 1982); *United States v. Roper*, 681 F.2d 1354, 1358 (CA11 1982).

2. The warrants failed to describe with sufficient specificity the items to be seized; hence they were invalid under the fourth amendment.

apparent and poignantly articulated in *Nix v. Williams*. Noting the close relationship and purpose of inevitable discovery to the harmless-error rule of *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), Chief Justice Burger states:

> If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... the deterrence rationale [deterrence of unlawful police conduct] has so little basis that the evidence should be received. Anything less would reject logic, experience and common sense.
>
> The requirement that the prosecution must prove the absence of bad faith ... would place courts in the position of withholding from juries relevant and undoubted truth that would have been available to police absent any unlawful police activity .... [I]t wholly fails to take into account the enormous societal cost of excluding truth in the search for truth in the administration of justice. Nothing in this Court's prior holdings supports any such formalistic, pointless, and punitive approach.

*Id.*, ―― U.S. at ――, 104 S.Ct. at 2509. And, again:

> Exclusion of physical evidence that would inevitably have been discovered adds nothing to either the integrity or fairness of a criminal trial.... Suppression, in these circumstances, would do nothing whatever to promote the integrity of the trial process, but would inflict a wholly unacceptable burden on the administration of criminal justice.
>
> ... [I]f the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings. In that situation, the State has gained no advantage at trial and the defendant has suffered no prejudice. Indeed, suppression of the evidence would operate to undermine the adversary system by putting the State in a *worse* position than it would have occupied without any police misconduct.

*Id.*, at ――, 104 S.Ct. at 2510.

■ Under the facts of this case, a search warrant could have been obtainable as in *Apker*, and any half-decent investigation would take the officers into the bedroom. There can be no doubt that the bedclothes with the incriminating bullethole in plain view would have been discovered inevitably by legitimate means. Thus, under *Nix* and *Apker* and the host of other inevitable discovery decisions, the bedclothes were properly admitted into evidence for the jury's consideration.

The situation in *Apker* easily applies in this case. No question exists but that a search warrant would properly issue to a search of the house in which a killing had occurred. Assuming arguendo that a search warrant would have been essential to get to the plain view discovery of the bedclothes in the bedroom, such is readily obtainable for a routine investigation of the probability of criminal activity as here present. Sections 542.271–.276, RSMo Cum.Supp.1983; *State v. Pennington*, 642 S.W.2d 646, 648 (Mo.1982); *State v. Bradley*, 485 S.W.2d 408, 410–11 (Mo.1972). And under *Nix*, which requires neither proof of lack of bad faith by police or clear and convincing proof of inevitable discovery, it is obvious that the bedclothes should be allowed into evidence.

## B. Exigent Circumstances

■ Mr. Butler was shot in his own home. Police responding to his plaint for aid were admitted entry by the dying man. *State v. Epperson*, referred to at the outset of this opinion, affords appropriate basis for the limited search of the victim's home, which was the scene of the crime. The facts of this case are at least as strong as *Epperson* to permit the hasty perusal of the home under exigent circumstances.

In *Epperson*, the defendant's mother-in-law had missed seeing her daughter and grandchildren for several days. When she

visited their house, also occupied by defendant, she noted with some suspicion that her daughter's purse was still in the home, although supposedly the daughter had gone shopping. She also "smelled the smell of death" and reported the incident to police, who some four hours later broke into defendant's home, finding dead bodies. An initial search was followed by a second search in which photographs were taken and certain incriminating items seized from limited areas of the house.

This Court noted that the search was justified under exigent circumstances and was performed within the reasonable time, spatial scope and limited intensity approved in *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). *Epperson*, 571 S.W.2d at 268. The warrantless search in this case was substantially more restrained and under circumstances at least as favorable as those existing in *Epperson*.

Although Mrs. Butler's telling to police of the place of shooting may be repugnant to her *Miranda* rights, the quick viewing of the bedroom is not offensive in this instance. Her comment that the shooting took place in the bedroom was no more than what was consistent with her best theory of the case—that she shot her husband in the bedroom as he approached her from the bed.

In this case as the police were admitted into the family room by the victim, a quick glance brought forth the .22 caliber rifle lying nearby. A hasty look about revealed no other person inside. The entire search of the family room, which was opened to police by Mr. Butler, kitchen (in which defendant was interrogated by police) and bedroom was conducted within the time space of one and a half hours and was minimally required for the preservation of evidence and to determine if others were present in the house. A visit to the bedroom, also in the small, single story, six room house, brought about instant discovery of the bullet hole in the bedcovers. There is no dispute that it was in plain view; nothing was moved to see it.

Certainly, the search in this instance is not offensive to the holdings of *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), or *Michigan v. Clifford*, —— U.S. ——, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984). In these latter cases the multiple warrantless searches decried were intensive and intrusive, involving up to four days of exhaustive sifting of the defendants' premises for incriminating evidence. That is not so in this case.[3] After all, *Mincey* fully adheres to the following proposition:

> [T]hat the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. Similarly, when police come upon the scene of a homicide they may make a prompt warrantless search of the area to see if there are other victims or if a killer is still on the premises.

*Id.*, 437 U.S. at 392, 98 S.Ct. at 2413.

The foregoing is essentially what occurred in this instance. And it is certain that the very limited look-about did not approach the intensity receiving reproval in *Mincey* and *Clifford*.

### C. Implied Consent to Search

But beyond the exigent circumstances search allowed by *Epperson*, further compelling reason exists for the warrantless search of the victim's home which disclosed evidence incriminating his assailant.

In this case, Mr. Butler opened the house to police who were summoned by him. As co-tenant with joint control of the house and the inside effects, Mr. Butler could give requisite consent to the search of the premises, *State v. Blair*, 638 S.W.2d 739, 750 (Mo. banc 1982), *reh'g denied*, 459 U.S. 1229, 103 S.Ct. 1240, 75 L.Ed.2d 472

---

3. For a thorough treatment of *Epperson* and a fine analysis of *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) and *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) and their impact on warrantless searches, *see* Note, *Warrantless Murder Scene Searches in the Aftermath of Mincy v. Arizona*, 58 Wash.U.L.Q. 367 (1980).

(1983), with the substance of the subsequent search being admissible against defendant. *State v. Timmons,* 574 S.W.2d at 954. The opening of the house to police after calling them leads to the logical conclusion that Mr. Butler was giving permission for a general search in connection with the detection and apprehension of his assailant.

This proposition is not unique. In the recent decision of *State v. Thompson,* 448 So.2d 666 (La.1984), the Louisiana Supreme Court holds that a defendant wife has diminished fourth amendment privacy interests in the home shared with her husband and in which she has murdered him. In *Thompson,* the husband was dead when police arrived, summoned by a daughter. In the case *sub judice,* the husband not only summoned police, he let them in before his death. Application of the proposition of implied consent to search by Mr. Butler of his own home, buttressed by *State v. Thompson,* is fitting for this case.

W. LaFave, *Search and Seizure, A Treatise on the Fourth Amendment,* § 6.5(e) (1978) is sharply on point on this issue with the observation:

> [I]t is almost as if there were an implied consent-in-advance by the deceased to enter his premises to investigate in the event of his death, corresponding to the consent which would be expected if the victim were only injured, so that even if the co-occupant is the prime suspect he may not by virtue of the death suddenly claim exclusive possession.

*Id.* at 461.

This was not a generalized investigation to ascertain a then unknown cause of death, for police had a very good notion from the victim's identification of his assailant. Further, the circumstances in which they found the defendant—outside, clad only in a nightgown on an extremely cold night—gave significant support to their well based suspicion.

LaFave, *supra,* offers further suitable suggestion:

> [I]n the common case in which the death scene investigation occurs at the

victim's residence, there *is* a consideration which, as a practical matter, distinguishes homicide cases from those involving rape, robbery or burglary. Certainly the victim of these latter offenses would desire that the police solve the crime and apprehend the perpetrator, and to this end would permit the police to enter the premises and conduct the necessary investigation. The homicide victim quite obviously cannot render this cooperation, but yet the need to check the immediate scene for clues is certainly no less in homicide cases.

*Id.* at 465.

The foregoing statement is dramatically appropriate to this case in which the victim actually let the police into his home. Certainly, it was primarily for his well being and to minister to him. But it is also reasonable to assume that he would want his assailant apprehended.

No reversible error appears with regard to the admission of the bedclothes.

## II.

Defendant next contends the trial court erred in denying her application for continuance in light of the extensive publicity occurring before her trial from the *United States v. Hinckley* decision regarding the defenses of insanity and diminished mental capacity.

Defendant, relying on the defense of diminished mental capacity, § 552.030.3(1), RSMo 1978, as amended by Mo.Laws 1980, p. 517, was scheduled to stand trial one week after John Hinckley, Jr. had been acquitted on an insanity defense for the attempted assassination of President Reagan.

During a hearing on the issue, defendant introduced numerous news articles, recently published and circulated in the Jasper County area regarding the *Hinckley* decision, which she urges were damaging to her defense. Defendant argues that by refusal of a continuance, she was denied her right to a trial by an impartial jury as guaranteed by the sixth amendment and

Mo. Const. art. I, §§ 10 and 18a. The trial court overruled her motion for continuance stating that the effect of the pretrial publicity about the defense of diminished capacity or insanity was too speculative and that defendant, during voir dire, could detect any potential jurors with preconceived notions which would prevent them from applying the law correctly.

■■■ This is essentially the same point considered and rejected in *State v. Lee*, 654 S.W.2d 876 (Mo. banc 1983). The voir dire of the venire panel is the proper resource to disclose any prejudice the jury may have as a result of such an incident as the Hinckley affair. The trial court is vested with substantial discretion in remedying any bias against a defendant in a circumstance as proposed in this instance, including the control of voir dire or granting a continuance. *Id.* at 880; *State v. Gaskin*, 618 S.W.2d 620, 626 (Mo.1981). No abuse of that discretion exists here, and the following from *State v. Lee*, 654 S.W.2d at 880, is entirely felicitous to this case: "Under the circumstances existing here, defendant's counsel's unsupported conjecture of prejudice due to the publicity surrounding the attempted assassination of President Reagan is not sufficient to establish a real probability of prejudice to defendant."

■■■ Defendant's theory that the Hinckley incident had a negative effect with the jury is without merit. There is no direct connection between defendant and Hinckley nor any relationship between their alleged crimes and punishment. Defendant has presented nothing to establish that the voir dire could not adequately provide the proper protection against bias or that any juror was influenced by the Hinckley case. *State v. Owens*, 537 S.W.2d 209, 211 (Mo. App.1976).

There was no abuse of trial court discretion in denying the continuance as requested.

### III.

■■■ Defendant's final point relates to the trial court's refusal to give her tendered instruction on justifiable use of force in self defense, in particular the defense based on the so-called "appearances doctrine," provided for in paragraph 5, MAI-CR2d 2.41.1. Though giving MAI–CR2d 2.41.1, the trial court's refusal to give paragraph 5 was on the basis that there was no evidence to support its submission.

Paragraph 5 as tendered by defendant provides:

If the defendant reasonably believed it was necessary to use the amount of physical force she used in order to protect herself from Stanley Butler, it is of no consequence that the appearances turned out to be false. If the defendant acted in lawful self-defense, as submitted in this instruction, she must be acquitted even though there was no purpose on the part of Stanley Butler to harm her.

The appearances doctrine obtains its cognomen by virtue of the fact that it justifies a defendant's action of self defense although the appearances causing that action later prove to be false. *State v. Minnis*, 486 S.W.2d 280, 283 (Mo.1972). But the instruction pertaining to that doctrine is submitted only if justified by the evidence. *State v. Demaree*, 362 S.W.2d 500, 503 (Mo. banc 1962); *State v. Mayo*, 559 S.W.2d 264, 266 (Mo.App.1977); Notes on use 6 to MAI–CR2d 2.41.1.

Defendant offered a substantial amount of psychiatric testimony that she had acted under a misperception of her husband's actions, that she overreacted from fear, anxiety and compulsion, and what seemed to her to be a dangerous situation was, in reality, a false appearance. It is on that basis that she sought application of the appearances doctrine.

Judge Crow in his majority opinion for the Southern District deals with defendant's argument on that point precisely and correctly:

The fallacy in the [defendant's] argument is that there was no evidence that Stanley Butler's actions, as related by [her] (the only witness), were anything other than what they appeared to be. According to [defendant], Stanley Butler

spoke in a hostile manner as he moved across the bed toward her just before the shooting. He was much larger than [she], and she testified she believed she needed the rifle, "Because I had no other defense against him. I couldn't outrun him, he was very agile." Additionally, he had injured [defendant] three times within the preceding nine months. [Defendant] testified that after the shooting, Stanley Butler pursued her through the house until she fled outside. [She] added that after her escape, she could see through the family room window, and observed Stanley Butler "looking for me and he had the gun, and so I hid until I saw the officers arrive."

Nothing in the evidence indicates that Stanley Butler's aggressive act, as described by defendant, was other than it appeared to be. There was, therefore, no evidence to support the theory that defendant misperceived the act and thereby mistook the force required to repel it. Accordingly, the trial court did not err in omitting paragraph 5 from MAI–CR2d 2.41.1. *State v. Robinson,* 629 S.W.2d 422, 424 (Mo.App. 1981).

Whether Stanley Butler did in fact behave as recounted by defendant was, of course, for the jury to determine, and in doing so the jury was not required to believe her. *State v. Porter,* 640 S.W.2d 125, 127 (Mo.1982); *State v. Malady,* 669 S.W.2d 52, 54 (Mo.App.1984); *State v. Moon,* 602 S.W.2d 828, 831 (Mo.App.1980).

Judgment affirmed.

All concur.