705 F.2d 293
 UNITED STATES of America, Appellee,
v.
Gary D. APKER, Appellant.
UNITED STATES of America, Appellee,
v.
Calvin DAVENPORT, Appellant.
UNITED STATES of America, Appellee,
v.
Raymond GEARHART a/k/a "Buzzard," Appellant.
UNITED STATES of America, Appellee,
v.
Janice FITZGERALD, Appellant.
 Nos. 82-1168, 82-1169, 82-1201 and 82-1242.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Dec. 15, 1982.
Decided April 19, 1983.
 
 Ronald D. Lahners, U.S. Atty., D. Neb., Thomas D. Thalken, First Asst. U.S. Atty., D. Neb., David A. Kubichek, Asst. U.S. Atty., D. Neb., Omaha, Neb., for appellee.
 James S. Jansen, David Herzog, Omaha, Neb., Alan Caplan, San Francisco, Cal., Jack S. Nordby, John R. Wylde, Minneapolis, Minn., for appellants.
 Before BRIGHT, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and McMILLIAN, Circuit Judge.
 FLOYD R. GIBSON, Senior Circuit Judge.
 
 
 1
 Gary Apker, Calvin Davenport, Raymond Gearhart, and Janice Fitzgerald each appeals a conviction under 18 U.S.C. app. Sec. 1202(a)(1) (1976) for being a felon in possession of a firearm. They make two major arguments: (1) the searches which produced the firearms admitted against them were executed pursuant to warrants which were invalid under both the Fourth and First Amendments, and (2) they were prejudiced by the joinder of a conspiracy count with the counts from which they appeal.
 
 
 2
 We find that the warrants violated the Fourth Amendment particularity requirement, but that the joinder was not prejudicial. We also find that the firearms admitted against Apker, Davenport, and Gearhart were nevertheless properly admitted under an exception to the exclusionary rule and therefore their convictions are affirmed. The firearms admitted against Fitzgerald should have been excluded and therefore her conviction is reversed.
 
 I. Facts
 
 3
 Apker, Davenport, and Gearhart are members of the Hells Angels of Omaha and Fitzgerald is the widow of a Hells Angels member. On February 18, 1981 a grand jury in the District of Nebraska returned a three-count indictment against the four appellants and six other persons. The indictment alleged that the indictees were members of the Hells Angels (or in Fitzgerald's case, an associate), and that as members they were involved in a conspiracy to distribute methamphetamine in violation of 21 U.S.C. Secs. 841(a)(1) and 846 (1976). The indictment charged that as part of the conspiracy the Hells Angels attempted to gain a monopoly on the methamphetamine traffic in Omaha and used threats, beatings, torture, and murder against persons who distributed methamphetamines not acquired from the Hells Angels. Pursuant to the indictment, arrest warrants were obtained.
 
 
 4
 On February 27, 1982, "indicia search warrants" also were obtained for premises alleged to be the residences of some of the indictees, including all four appellants. The indicia warrants did not authorize the seizure of contraband or fruits or instrumentalities of crime. Rather, they authorized the seizure of indicia of membership in the Hells Angels. All the indicia warrants were identical in their description of the things to be seized. The entire description is as follows:
 
 
 5
 A. Sleeveless leather and jean jackets with a Death's Head insignia with wings on the back with the notation "Hell's Angels" written above the Death's Head and the state that the party is a member of, in this case Nebraska, is written beneath the Death's Head symbol (commonly and hereafter referred to as "Hell's Angels's Colors").
 
 
 6
 B. A metal belt buckle which states "Hell's Angels" on it.
 
 
 7
 C. Certain plaques, mirrors and other items which give the names of members of the Hell's Angels.
 
 
 8
 D. Photographs which depict the association of members of the Hell's Angels.
 
 
 9
 E. Telephone books with telephone numbers listed therein of members of the Hell's Angels, which includes local and national members.
 
 
 10
 F. Certain papers relating to Club activities, expenditures, financial records, Club rules and regulations.
 
 
 11
 G. Red T-shirts with "Hell's Angels" printed on them.
 
 
 12
 The affidavit supporting the search warrants said the indicia were necessary because proving the indictees' associations with the Hells Angels was necessary to prove their involvement in the alleged Hells Angels drug conspiracy.
 
 
 13
 The arrest and search warrants were executed at approximately 7:00 a.m. on February 28, 1981, by teams of federal and state law enforcement officers. Before the warrants were served the officers met at the Omaha police headquarters and were briefed as to the execution of the warrants. They were told that appellants had felony convictions and therefore could not lawfully possess firearms. They were told to be on the lookout for guns and drugs. They were also told that a judge would be standing by to execute state search warrants if drugs were found.
 
 
 14
 Apker, Davenport, and Gearhart were served at residences they were apparently sharing with a woman.[1] Guns and drugs were found at each residence. Fitzgerald was served at a residence where another woman was present. Guns, but not drugs, were found at her residence. The discovery of the drugs lead to state search warrants which were executed the same morning. On April 23, 1981, the superseding indictment, under which appellants were tried, charged all four appellants with being felons in possession of firearms and charged Apker, Davenport, and Gearhart with possession of a controlled substance with intent to distribute.
 
 
 15
 Jury selection for the trial of appellants and two others[2] began on September 2, 1981, and the government's opening statement came one month later. On November 3, 1981, the district court[3] dismissed the conspiracy counts. The remaining counts were submitted to the jury on November 12, 1981, and the verdicts were returned on November 25, 1981. Apker, Davenport, and Gearhart were found guilty of simple possession of a controlled substance, rather than possession with intent to distribute. Each received a sentence of one year for these counts and they do not appeal the drug convictions. All four appellants were found guilty of being a felon in possession of a firearm and received two-year sentences. It is the firearm convictions that are being appealed.[4]
 
 II. Validity of the Indicia Warrants
 
 16
 Appellants argue that the indicia warrants are invalid because they violate both the Fourth Amendment and the First Amendment. In evaluating these claims we are largely writing on a clean slate. Counsel have informed us that to the best of their knowledge indicia warrants have been used only once before their use in the instant case. These were obtained in June 1979 in connection with the prosecution of California Hells Angels members under the Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C. Sec. 1962(c) (1976). One appellate court decision discusses the indicia warrants, United States v. Chesher, 678 F.2d 1353 (9th Cir.1982), but it was decided on an issue not raised in the instant case. The Chesher court ruled that the defendant was entitled to a hearing on the issue of whether probable cause was based on a recklessly false statement, and that the indicia warrant issued was not justified without finding proof of his current associations with the Hells Angels. Id. at 1362-64. Another case dealing with the same set of indicia warrants involved in Chesher is now pending before the Ninth Circuit. United States v. Rubio, 703 F.2d 1124 (9th Cir.1983).
 
 
 17
 A. Fourth Amendment.
 
 
 18
 Appellants' Fourth Amendment arguments can be put into four groups: (1) indicia of membership in a legal organization, i.e., the Hells Angels, cannot be the proper subject of a search because there is not a sufficient nexus between the evidence sought and the crime being investigated, (2) the warrants had the effect of being general warrants because they failed to describe the things to be seized with sufficient particularity, (3) the affidavit supporting the application for the search warrants did not establish probable cause to believe that there would be indicia of membership in the Hells Angels at the searched premises, and (4) the indicia warrants were obtained as a pretext to search for guns and drugs.[5] We find that there was a sufficient nexus between the indicia of membership in the Hells Angels Motorcycle Club of Nebraska (Hells Angels) and the crime charged, there was probable cause for the warrants, and the warrants were not pretextual. However, we find that in light of the heightened scrutiny required by the First Amendment interests involved, the warrants failed to describe the items to be seized with sufficient particularity, and therefore the warrants were invalid under the Fourth Amendment.
 
 
 19
 1. Indicia as the Valid Subject of a Search: The Nexus Requirement.
 
 
 20
 Appellants' first Fourth Amendment issue is whether there is a sufficient nexus between membership in a legal organization (the Hells Angels) and criminal activity so as to justify a search for indicia of membership. Appellants argue there was no nexus between membership and illegal activity. The government argues that the indictment's allegation that one of the purposes of the Hells Angels was a criminal conspiracy establishes a nexus between membership and criminal activity.
 
 
 21
 The rule is well settled that police searches are not limited to instrumentalities or fruits of crime or contraband. Police can search for "mere evidence" of crime if there is a nexus between the item to be seized and criminal behavior. Warden v. Hayden, 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967). A magistrate must determine whether there is probable cause to believe that the evidence sought will "aid in a particular apprehension or conviction." Id. When dealing with fruits, instrumentalities, or contraband, the nexus between the item to be seized and criminal behavior is automatically provided. But in the case of "mere evidence," such as the indicia of membership in the Hells Angels, finding the nexus can be more difficult.
 
 
 22
 The government puts forth two justifications for a search for indicia of membership in the Hells Angels. The first is that appellants' membership in the Hells Angels would tend to show their association with each other in support of the conspiracy charge. The second is that proof of membership would help establish the charge in the indictment that appellants and others used the Hells Angels organization for criminal activity, i.e., controlling the methamphetamine traffic in Omaha. There can be no doubt that establishing appellants' membership in the Hells Angels would not establish that they were engaged in an illegal conspiracy; however, we believe that proof of membership in the Hells Angels would "aid in a particular ... conviction" because such proof would be probative on the issue. Proof of membership would help show appellants' associations with each other and their opportunity to use the Hells Angels organization for illegal activities.
 
 
 23
 A wide variety of items might be admitted into evidence in a conspiracy trial; the district court has particularly broad discretion in a conspiracy trial in determining which items will be admitted into evidence. United States v. Skillman, 442 F.2d 542, 551-52 (8th Cir.), cert. denied, 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971). We have held that proof of association with a political organization is admissible in a conspiracy trial to show the association of defendants with each other. United States v. Baumgarten, 517 F.2d 1020, 1029 (8th Cir.), cert. denied, 423 U.S. 878, 96 S.Ct. 152, 46 L.Ed.2d 111 (1975) (evidence concerning the history of Students for a Democratic Society relevant and admissible to show the association of defendants with one another). While proof of association or acquaintance alone is not enough to establish the conspiracy, it has sufficient bearing on the issue to make it admissible. United States v. Giese, 597 F.2d 1170, 1187 (9th Cir.), cert. denied, 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). Furthermore, evidence of appellants' association with the Hells Angels would help to prove their opportunity to use the Hells Angels organization for criminal activities.
 
 
 24
 Appellants suggest that their First Amendment right of association is involved in this case and we should examine the nexus requirement with more scrutiny when the First Amendment is involved. While the Supreme Court has indicated that a higher standard of scrutiny is necessary in Fourth Amendment cases with First Amendment implications, it has done so in the context of applying the Fourth Amendment particularity requirement. Stanford v. Texas, 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 (1965); Zurcher v. Stanford Daily, 436 U.S. 547, 564, 98 S.Ct. 1970, 1980, 56 L.Ed.2d 525 (1978). We discuss this heightened scrutiny as it relates to the particularity requirement at pages 300-301, infra.
 
 
 25
 Appellants also argue the indicia had no relevance because they had freely proclaimed their association with the Hells Angels. However, the police cannot be expected to know what elements of proof suspects will concede. Indeed, perhaps it is only because of the evidence seized that appellants have been willing to concede membership in the Hells Angels. It is entirely possible that in some cases the indicia of membership would provide crucial evidence in a case, either to show the association of the alleged co-conspirators with each other or to show that the mode of operation of the conspirators was to use the Hells Angels organization. Therefore, we find that there is a sufficiently close nexus between the items seized and alleged criminal behavior.
 
 
 26
 2. Particularity in the Description of the Items to be Seized.
 
 
 27
 The second major Fourth Amendment issue is whether the indicia warrants satisfied the Fourth Amendment requirement that warrants "particularly describ[e] the ... things to be seized." Some items were described with specificity, such as Hells Angels leather and jean jackets, red Hells Angels T-shirts, a Hells Angels belt buckle, and photographs depicting the association of members of the Hells Angels. Other items were less specific, such as telephone books with the numbers of Hells Angels members (local and national) and papers relating to Hells Angels activities, expenditures, rules, and regulations. The broadest description was for "items which give the names of members of the Hells Angels."[6]
 
 
 28
 a. General Principles.
 
 
 29
 The Supreme Court has repeatedly stated the underlying considerations behind the particularity requirement. The requirement "makes general searches ... impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." Andresen v. Maryland, 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976), quoting Stanford v. Texas, 379 U.S. at 485, 85 S.Ct. at 511. See also United States v. Clark, 531 F.2d 928, 931 (8th Cir.1976). The problem posed by a general warrant "is not of intrusion per se, but of a general, exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). In applying the particularity requirement, we recognize that "the degree of specificity required is flexible and may vary depending on the circumstances and the type of items involved." United States v. Muckenthaler, 584 F.2d 240, 245 (8th Cir.1978). The Supreme Court has said: "A seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material." Roaden v. Kentucky, 413 U.S. 496, 501, 93 S.Ct. 2796, 2799, 37 L.Ed.2d 757 (1973).
 
 
 30
 The district court, in finding that the indicia warrants met the particularity requirement, relied on United States v. Dennis, 625 F.2d 782 (8th Cir.1980) and Andresen, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627. Dennis dealt with a defendant charged with loansharking. Federal authorities obtained a search warrant for "certain books and records (or items of evidence) relating to the extortionate credit transaction business." We held that the warrant in Dennis was valid because "[w]here the precise identity of goods cannot be ascertained at the time the warrant is issued, naming only the generic class of items will suffice because less particularity can be reasonably expected than for goods (such as those stolen) whose exact identity is already known at the time of issuance." 625 F.2d at 792, quoting United States v. Johnson, 541 F.2d 1311, 1314 (8th Cir.1976); see also United States v. Coppage, 635 F.2d 683, 687 (8th Cir.1980) (warrant found valid which authorized search for "books, records, chemical equipment, and personal papers relating to the manufacture and distribution of methamphetamine"). The language of the warrant in Dennis was very similar to that of the indicia warrants issued here. However, we must follow the principles of Roaden and Muckenthaler and examine the totality of the circumstances--including the First Amendment interests involved, the nature of the items to be seized, and the nature of an indicia warrant.
 
 
 31
 b. Level of Scrutiny: "Scrupulous Exactitude."
 
 
 32
 Appellants argue that we should examine the warrants with more scrutiny because First Amendment associational rights are involved. The Supreme Court has stated: "Where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.' " Zurcher, 436 U.S. at 564, 98 S.Ct. at 1980, quoting Stanford v. Texas, 379 U.S. at 485, 85 S.Ct. at 511. In Stanford v. Texas, a warrant authorized the seizure of "books, records, pamphlets, cards, receipts, lists, memoranda, pictures, recordings and other written instruments concerning the Communist Party of Texas." The Supreme Court held that the warrant was too broad, in violation of the Fourth Amendment particularity requirement. 379 U.S. at 478-80, 486, 85 S.Ct. at 508-09, 512. The Supreme Court stated: "[T]he constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas which they contain.... No less a standard could be faithful to First Amendment freedoms." 379 U.S. at 485, 85 S.Ct. at 511 (citations and footnote omitted). The language of the instant warrants is similar to that in the Stanford v. Texas warrant.
 
 
 33
 In Zurcher the "scrupulous exactitude" standard was applied. The Supreme Court upheld the search of a newspaper's office for photographs of a violent clash between demonstrators and police at the Stanford University Hospital. The Court emphasized that the "scrupulous exactitude" standard does not erect a barrier to searches:
 
 
 34
 [T]he prior cases do no more than insist that the courts apply the warrant requirements with particular exactitude when First Amendment interests would be endangered by the search. As we see it, no more than this is required where the warrant requested is for the seizure of criminal evidence reasonably believed to be on the premises occupied by a newspaper. Properly administered, the preconditions for a warrant--probable cause, specificity with respect to the place to be searched and the items to be seized, and overall reasonableness--should afford sufficient protection against the harms that are assertedly threatened by warrants for searching newspaper offices.
 
 
 35
 436 U.S. at 565, 98 S.Ct. at 1981.
 
 
 36
 The government argues that the "scrupulous exactitude" standard is not applicable to the instant case. The government points out that the documents to be seized were not being sought for the ideas they contained, rather they were sought because they constituted indicia of membership in an organization appellants allegedly used for unlawful activities.[7] Stanford v. Texas specifically distinguished the books in that case from the type of books in the Dennis case: "A 'book' which is no more than a ledger of an unlawful enterprise thus might stand on a quite different constitutional footing from the books involved in the present case." 379 U.S. at 485 n. 16, 85 S.Ct. at 512 n. 16.
 
 
 37
 Nevertheless, we conclude that First Amendment interests are involved in this case and therefore the "scrupulous exactitude" standard is appropriate. We reach this conclusion for two reasons. First, in Stanford v. Texas, membership in the Communist Party was per se illegal, so seizure of some of the books involved there would have constituted indicia of membership in an organization which would be unlawful. The Supreme Court nevertheless required "scrupulous exactitude" for the particularity requirement. Second, although in this case the items were not seized for their ideas, as were the books in Stanford v. Texas, they were seized for the associations they demonstrated. Just as the ideas in a book are protected by the First Amendment, so are associations so protected. See NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 462, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958). Evidence of membership in a particular organization can severely affect the exercise of First Amendment rights, possibly through reprisals in the community. NAACP, 357 U.S. at 462-63, 78 S.Ct. at 1171-72. Admittedly, the Hells Angels is not as respected an organization as the NAACP. However, to ensure the protection of the associational rights of desirable organizations, it is necessary that warrants for searches for evidence of membership in bona fide organizations meet the Fourth Amendment requirements with scrupulous exactitude.[8] Analogously, the Supreme Court in formulating the "scrupulous exactitude" requirement in Stanford v. Texas, relied on Marcus v. Search Warrant, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961), where the Court held that certain procedures had to be followed in the seizure of publications unprotected by the First Amendment (obscene publications) to ensure that protected publications were not seized or held for too long a period of time. 367 U.S. at 730-31, 737, 81 S.Ct. at 1715-16, 1719. The same rationale applies to organizations, requiring scrupulous exactitude to ensure that protected associations are not endangered. Thus, the possible implication of protected First Amendment associational rights in this case requires the scrupulous exactitude standard.
 
 
 38
 c. Application of the Law.
 
 
 39
 When we apply the particularity requirement with scrupulous exactitude, we conclude that the indicia warrants were inadequate. First, we note that even outside the First Amendment, a search for documents poses particular dangers:
 
 
 40
 [T]here are grave dangers inherent in executing a warrant authorizing a search and seizure of a person's papers that are not necessarily present in executing a warrant to search for physical objects whose relevance is more easily ascertainable. In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized.... [R]esponsible officials, including judicial officials, must take care to assure that they are conducted in a manner that minimizes unwarranted intrusions upon privacy.
 
 
 41
 Andresen, 427 U.S. at 482 n. 11, 96 S.Ct. at 2749 n. 11. In United States v. Bennett, 409 F.2d 888, 897 (2nd Cir.1969), cert. denied, 396 U.S. 852, 90 S.Ct. 113, 24 L.Ed.2d 101 (1969), 402 U.S. 984, 91 S.Ct. 1670, 29 L.Ed.2d 149 (1971), Judge Friendly put the concern this way:
 
 
 42
 The reason why we shrink from allowing a personal diary to be the object of a search is that the entire diary must be read to discover whether there are incriminating entries; most of us would feel rather differently with respect to a "diary" whose cover page bore the title "Robberies I Have Performed." Similarly the abhorrence generally felt with respect to "rummaging" through the contents of a desk to find an incriminating letter would not exist in the same measure if the letter were lying in plain view.
 
 
 43
 The dangers of document searches described in Andresen and Bennett are present in the instance case: the warrants authorized searches for papers relating to Hells Angels activities, items with names of Hells Angels members, and telephone books with names and numbers of Hells Angels members. The dangers of document searches alone was not enough for the Supreme Court to find the warrant in Andresen invalid or for us to find the warrant in Dennis invalid; however, the "scrupulous exactitude" standard triggered by First Amendment concerns was not involved in Andresen or Dennis.
 
 
 44
 Second, we are mindful of the proposition that a warrant must be as specific as possible. United States v. Wuagneux, 683 F.2d 1343, 1349 (11th Cir.1982); see Dennis, 625 F.2d at 792.[9]
 
 
 45
 Third, we believe that a high degree of specificity is particularly needed with an indicia warrant. The indicia warrants, like many warrants for searches for documents, authorized the perusal of almost any document in the subject's residence. The indicia warrants, like many warrants, authorized the search of nearly every corner of the residence. Unlike most warrants, these warrants were issued to obtain evidence on just one fact--membership in the Hells Angels. Unlike most warrants, the evidence on this issue would be needlessly cumulative once enough evidence was obtained to establish membership. While additional evidence would usually show the breadth of criminal activity, in the instant case additional evidence would at some point have no additional probative value in determining membership. Therefore, some of the items in the indicia warrants would do nothing to aid in the conviction. An indicia warrant allows an almost unlimited search for the purported purpose of obtaining evidence on a very narrow matter for which only a limited amount of evidence would be useful. As a result, there was a tremendous potential for abuse.[10] Given the potential for abuse, we feel the indicia sought should be specifically identified in the warrant, and if this is impossible there should be an explanation as to why it is impossible and whether the non-specified items could actually aid in the conviction.
 
 
 46
 We are not asking law enforcement officials to assess exactly how much evidence is needed for a conviction. In the situation where fruits or instrumentality of crime are being sought, more evidence of this type would tend to show a broader scope of criminal activity. The same reasoning would apply to many types of "mere evidence." For instance, if documents are being sought to show that a suspect is loansharking, more documents would show a broader scope of criminal activity. And even when indicia are being sought just to prove membership, we would permit the accumulation of evidence when the items were specifically identified because the specific identification would help prevent a free-wheeling search into a person's possessions.
 
 
 47
 Part of the warrant in this case would meet this standard. The description of the jackets, the belt buckle, T-shirts, photographs,[11] and plaques and mirrors are sufficiently specific. If the warrants said no more they would be valid. But the search for "other items" with names of members, telephone books, and papers relating to the Hells Angels is too general for a search for indicia to prove membership in the Hells Angels. Such evidence would be unnecessarily cumulative. Such items may be seizable with more specific information. For instance, a search of a suspect's personal telephone book to see if alleged co-conspirators were listed would not be needlessly cumulative. However, the telephone books were not sought for such a purpose. The purpose of the search was simply to find indicia of membership. A search for indicia for the purpose of proving membership in an organization should be limited to specifically enumerated items whose relevance and probative value is shown.
 
 
 48
 The practical effect of the warrant in the instant case is that it was very close to a general warrant. We will require that such a broad warrant for such a narrow purpose specifically enumerate the items to be seized or at least explain why a more specific showing cannot be made and why the evidence is needed.
 
 
 49
 3. Probable Cause.
 
 
 50
 Appellants next argue that the indicia warrants lacked probable cause. They argue that the indictment, which was incorporated by reference into the application for the search warrant, did not provide a basis for the search warrant and there was not probable cause to believe the indicia would be found at the searched premises. We find there was probable cause for the warrants.
 
 
 51
 Probable cause to search requires (1) a finding of probability of criminal activity, and (2) a finding or probability of concealment of evidence on specific premises. United States v. Deggendorf, 626 F.2d 47, 51 (8th Cir.), cert. denied, 449 U.S. 986, 101 S.Ct. 405, 66 L.Ed.2d 249 (1980). The indictment satisfied the first element, providing the probable cause for criminal activity. The Supreme Court has held that an arrest warrant can be based on an indictment "because the grand jury's determination that probable cause existed for the indictment also establishes that element for the purpose of issuing a warrant for the apprehension of the person so charged." Giordenello v. United States, 357 U.S. 480, 487, 78 S.Ct. 1245, 1250, 2 L.Ed.2d 1503 (1958). More recently the Supreme Court has stated:
 
 
 52
 [A]n indictment, 'fair upon its face,' and returned by a 'properly constituted grand jury,' conclusively determines the existence of probable cause and requires issuance of an arrest warrant without further inquiry. The willingness to let a grand jury's judgment substitute for that of a neutral and detached magistrate is attributable to the grand jury's relationship to the courts and its historical role of protecting individuals from unjust prosecution.
 
 
 53
 Gerstein v. Pugh, 420 U.S. 103, 117 n. 19, 95 S.Ct. 854, 865 n. 19, 43 L.Ed.2d 54 (1975) (citations omitted). If an indictment can be used to establish the probability of criminal activity for an arrest warrant we see no reason why an indictment should not be able to establish probability of criminal activity for a search warrant. Of course, before a search warrant can be issued, the second prong--probability of concealment of evidence at a specific premises--must be met. Appellants challenge the warrant on this basis as well.
 
 
 54
 We agree with the district court that this contention has little merit. Probable cause to believe Hells Angels indicia would be at the four residences at which appellants were located was based on several factors. Appellants' associations with the Hells Angels were based in part on the indictment which alleged that Fitzgerald was a widow of a Hells Angels member and the other appellants were Hells Angels members at the time of the indictment. Appellants' links to the particular residences to be searched were based in part on official records, such as utility records in the case of Apker, land ownership records in the case of Gearhart, and postal records in Fitzgerald's case. Other support for the search warrant came from confidential informants. The affidavit in the application for the search warrants said the confidential informants, who were proved reliable in the past and based their information on personal knowledge, had observed Davenport's Hells Angels colors at the fourth searched premises and the informants said Apker, Davenport, and Gearhart were Hells Angels members. Most of the remainder of the support for the search warrant came from references in the affidavit to observations of unnamed police officers that vehicles registered to or driven by each appellant were seen at the respective searched residences. The affidavit also said police officers observed that Fitzgerald's husband had received a Hells Angels funeral and she had retrieved his Hells Angels ring and belt buckle.
 
 
 55
 The affidavit clearly provided ample support for the search warrants. The indictment and public records provided a great deal of support for the warrants. This was buttressed by the observation of police officers, who are entitled to a presumption of credibility when they are the unnamed informants in an affidavit supporting a search warrant application. United States v. Beusch, 596 F.2d 871, 874 (9th Cir.1979); United States v. Harrick, 582 F.2d 329, 332 (4th Cir.1978); see United States v. Ventresca, 380 U.S. 102, 111, 85 S.Ct. 741, 747, 13 L.Ed.2d 684 (1965). The information from the informants alone could have supported the search warrant, because their credibility was shown by their record for reliability and their personal knowledge. United States v. Fleming, 566 F.2d 623, 625 (8th Cir.1977). When all the factors are considered there was clearly probable cause to believe the indicia would be found at the designated residences.
 
 
 56
 4. Pretext.
 
 
 57
 The last Fourth Amendment argument of appellants is that the indicia warrants were obtained merely as a pretext for a general search for guns and drugs. Appellants argue that the true purpose of the search was not disclosed to the magistrate issuing the warrant. The true purpose was shown by the presearch meeting at which officers were told to be on the lookout for guns and drugs and the fact that machinery was set up to quickly issue state search warrants.
 
 
 58
 The scope of a search is limited by its authorization. Walter v. United States, 447 U.S. 649, 656, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (1980). "The search must be one directed in good faith toward the objects specified in the warrant or for other means and instrumentalities by which the crime charged has been committed. It must not be a general exploratory search ...." Gurleski v. United States, 405 F.2d 253, 258 (5th Cir.1968), cert. denied, 395 U.S. 977, 981, 89 S.Ct. 2127, 2140, 23 L.Ed.2d 765, 769 (1969), cited with approval in United States v. Rettig, 589 F.2d 418, 423 (9th Cir.1978).
 
 
 59
 Appellants' allegations are not frivolous, particularly when one considers the manpower and time devoted to the searches and the very limited probative value of the items sought under the indicia warrants. See pages 302-303, supra. Compare Rettig, 589 F.2d at 421 (indicia of residence in a household sought under warrant which also authorized seizure of marijuana). However, the true purpose or bad faith of the police is a question of fact, and the district court's findings of fact on a motion to suppress are ordinarily subject to the clearly erroneous standard of review. United States v. Williams, 604 F.2d 1102, 1121 (8th Cir.1979). The district court found that the manner of execution of the warrants (as opposed to the warrants on their face) did not make for a general search. Implicit in this finding is the finding that law enforcement officers did not use the indicia warrants as a pretext to search for items other than those specified in the warrant. In light of the justifications for the presearch meeting put forth by the government, such as the need to point out that the persons to be arrested had firearm disabilities, we do not find the district court's conclusion clearly erroneous.
 
 
 60
 B. First Amendment.
 
 
 61
 Appellants argue that the indicia warrants were invalid under the First Amendment as well as the Fourth Amendment. They argue that the warrants infringed their right of association.
 
 
 62
 As we stated previously, there was a sufficient nexus between the items to be seized and criminal behavior to justify a search warrant. The Supreme Court said in Zurcher: "[T]he prior cases do no more than insist that the courts apply the warrant requirements with particular exactitude when First Amendment interests would be endangered by the search." 436 U.S. at 565, 98 S.Ct. at 1981.
 
 
 63
 There is some support for appellants' position in another line of cases highlighted by NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), and Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963). In these cases the Supreme Court reversed contempt convictions of persons who refused to produce NAACP membership lists based on the members' associational rights. In NAACP, the State of Alabama brought an equity suit to oust the NAACP from Alabama. In the course of the action the trial court ordered the NAACP to produce many of its records, including its membership lists. The NAACP refused to produce the membership lists and was held in contempt. The Supreme Court reversed, finding that Alabama had not shown a compelling state interest to justify subordination of First Amendment associational rights. 357 U.S. at 463, 466, 78 S.Ct. at 1172, 1173. In Gibson the president of the Miami, Florida branch of the NAACP refused to bring membership lists to a committee hearing to assist him in answering questions on whether fourteen alleged Communists were members of the Miami NAACP. Gibson was held in contempt for this refusal. The Supreme Court held there was not a sufficient nexus between the membership list and a compelling state interest in investigating Communists to justify compelled disclosure. 372 U.S. at 546, 554-57, 83 S.Ct. at 893, 897-99. Appellants argue that they are entitled to the protection offered by these cases.
 
 
 64
 The compelling state interest test articulated in NAACP and Gibson would appear to be more protective than the tests applied for the Fourth Amendment. Also, we are not inclined to see the distinction between contempt judgments and search warrants important in this particular context; the harm to associational rights would be the same whether the membership lists were obtained by the threat of a contempt judgment or by means of a search warrant. However, other factors make the NAACP cases inapplicable to the instant case.
 
 
 65
 First, the NAACP cases deal with membership lists only. Therefore, these cases are relevant only as to that part of the warrants authorizing seizure of membership lists. Second, in the NAACP cases there was evidence that harm would result from disclosure of the membership list. NAACP, 357 U.S. at 462-63, 78 S.Ct. at 1171-72; Gibson, 372 U.S. at 548 n. 3, 83 S.Ct. at 894 n. 3. In the instant case we are dealing with a group whose members sometimes publicly identify themselves as Hells Angels members by their dress, so additional harm from disclosure of membership lists is unlikely. Third, it is very possible that the state could meet the compelling state interest test in the instant case. The Supreme Court has upheld compelled disclosure of Ku Klux Klan membership lists, taking judicial notice of the Klan's unlawful activities. New York ex rel. Bryant v. Zimmerman, 278 U.S. 63, 75-77, 49 S.Ct. 61, 65-66, 73 L.Ed. 184 (1928) distinguished in NAACP, 357 U.S. at 465-66, 78 S.Ct. at 1173-74. In a post-NAACP case, the Supreme Court upheld compelled disclosure of the membership list of the Communist Party of the United States because the Subversive Activities Control Board could rationally conclude that the Communist Party used violent means to destroy government. Communist Party of the United States v. SACB, 367 U.S. 1, 90-105, 81 S.Ct. 1357, 1407-1415, 6 L.Ed.2d 625 (1961). See also L. Tribe, American Constitutional Law Sec. 12-23, at 708 (1978).
 
 
 66
 Because of our disposition of the Fourth Amendment issue, we need not determine the potential harm from Hells Angels membership disclosure or whether there is a sufficient state interest to justify membership disclosure. On the record before us, however, appellants clearly have not made out a First Amendment claim requiring invalidation of the part of the warrants authorizing searches for membership lists.
 
 III. Suppression of the Evidence
 
 67
 The government argues that even if the indicia warrants were invalid, the guns admitted against three of the appellants were admissible because they were properly seized during execution of the arrest warrants or were seized or would have been seized pursuant to state search warrants.
 
 
 68
 During the execution of arrest warrants for Apker, Davenport, and Gearhart, law enforcement officers observed suspected controlled substances in plain view, and as a result they obtained a state search warrant for each premises. Officers saw the suspected controlled substances at Apker's residence while conducting a "sweep search," i.e., a search for the purpose of looking for persons at the premises who might present a security risk. United States v. Briddle, 436 F.2d 4, 6-8 (8th Cir.1970), cert. denied, 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 824 (1971). At the residence where Davenport was found, officers saw the suspected drugs in the kitchen when they followed Davenport into the kitchen to get his clothes. Police have a right to accompany a person under custodial arrest in his residence. Washington v. Chrisman, 455 U.S. 1, 6-7, 102 S.Ct. 812, 816-817, 70 L.Ed.2d 778 (1982). At Gearhart's residence police were searching Gearhart's bedroom for weapons before allowing an undressed woman to get dressed in the privacy of the bedroom.[12] There is no question that the discovery of the suspected controlled substances at each residence was proper and that therefore the state search warrants were valid. Nothing was discovered during the sweep search at Fitzgerald's residence and no state search warrant was obtained for that residence.
 
 
 69
 The record does not make clear which guns were seized pursuant to the invalid federal warrants before the state warrants were obtained. The government argues that this question need not be resolved because even if the guns were obtained under the invalid indicia warrants, it is enough that they would have been seized under the valid state warrants.
 
 
 70
 The government's position is based on the "inevitable discovery" exception to the exclusionary rule. This exception allows illegally obtained evidence to be admitted if it would have been discovered in the course of a proper investigation. C. Wright, Federal Practice and Procedure, Sec. 408, at 453-55, Sec. 677, at 794-95 (1982). The Supreme Court has not explicitly passed on this exception, id., nor have we. United States v. Kelly, 547 F.2d 82, 85-86 (8th Cir.1977). The First, Second, Third, Fifth, Seventh, Ninth, and Eleventh Circuits have adopted the inevitable discovery exception. United States v. Bienvenue, 632 F.2d 910, 913-14 (1st Cir.1980); United States v. Ceccolini, 542 F.2d 136, 140 (2nd Cir.1976), rev'd on other grounds, 435 U.S. 268, 273, 98 S.Ct. 1054, 1058, 55 L.Ed.2d 268 (1978); Government of Virgin Islands v. Gereau, 502 F.2d 914, 927-28 (3rd Cir.1974), cert. denied, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975), 424 U.S. 917, 98 S.Ct. 1119, 47 L.Ed.2d 323 (1976); United States v. Brookins, 614 F.2d 1037, 1042, 1042 n. 2 (5th Cir.1980);[13] United States ex rel. Owens v. Twomey, 508 F.2d 858, 865-66 (7th Cir.1974); United States v. Kandik, 633 F.2d 1334, 1336 (9th Cir.1980). Only the Sixth Circuit has explicitly rejected the inevitable discovery exception. United States v. Griffin, 502 F.2d 959, 961 (6th Cir.), cert. denied, 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974).
 
 
 71
 The inevitable discovery exception usually arises in a slightly different context than the one in this case. Ordinarily the element that made the seizure illegal was a prior illegality, i.e., the seizure in question was illegal because it was "the fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 484-88, 83 S.Ct. 407, 415-417, 9 L.Ed.2d 441 (1963). In the instant case the seizure was illegal because the warrant was invalid and not because of a prior illegality. However, we do not see a basis for distinguishing between the causes of the illegality. In fact, the policy behind the exclusionary rule supports application of the "inevitable discovery" exception to this case more than it supports another exception to the exclusionary rule. In Wong Sun Justice Brennan stated the exclusionary rule does not apply when the "connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint.' " 371 U.S. at 487, 83 S.Ct. at 417; quoting Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939). The Court refused to apply a "but for" test; the fact that the evidence would not have come to light but for the illegal actions of police does not require exclusion. Id. 371 U.S. at 487-88, 83 S.Ct. at 417. In the instant case the evidence passes the "but for" test; regardless of illegal police conduct, the evidence would have been discovered.
 
 
 72
 Furthermore, the deterrent effect of the exclusionary rule would remain because at the time police engage in an illegal search they would not know whether or not a later, legal discovery was inevitable. For instance, a police officer would not feel free to conduct a warrantless search while his partner is seeking a warrant. The officer would not know whether the warrant would be issued and what the scope of the search allowed by the warrant would be. Also, in this case the time lapse between execution of the federal and state warrants was only a couple of hours.
 
 
 73
 Therefore, we join the great majority of the circuits and apply the inevitable discovery rule. In this case the illegal warrant clearly did no more than hasten the discovery of the guns. We do not think that probative evidence should be excluded merely because an invalid warrant affected the timing of the discovery of the evidence. The guns admitted against Apker, Davenport, and Gearhart would be admissible under the inevitable discovery exception to the exclusionary rule. The government admits that if the indicia warrants are invalid no weapons would be admissible against Fitzgerald.[14]
 
 
 74
 Another question relating to the suppression of the evidence is whether we should sever the general parts of the warrant and suppress only those items which could not have been seized pursuant to the specific parts of the warrant. This is the approach suggested by the dissent.
 
 
 75
 The approach of severing the general parts of a warrant, rather than considering the entire warrant invalid, has been embraced by four circuits, although in a more narrow version than that suggested by the dissent. United States v. Riggs, 690 F.2d 298 (1st Cir.1982); United States v. Christine, 687 F.2d 749 (3d Cir.1982); United States v. Cardwell, 680 F.2d 75 (9th Cir.1982); United States v. Cook, 657 F.2d 730 (5th Cir.1981). Although these courts accepted the severance approach in principle, no court has permitted the admission of items found in plain view while executing the specific parts of the warrant. We would have to adopt an expansive, plain view-severance approach to allow the guns to be admitted in this case. In Riggs and Cook, the courts were addressing the admissibility of items which were specifically described in the warrant. In Christine, a concurring judge would have adopted the plain view-severance approach, but the majority did not adopt that rule. In Cardwell, the severance approach was embraced only in dicta; the court did not discuss a plain view extension.
 
 
 76
 The version of the plain view extension suggested by the dissent is particularly expansive. There is nothing in the record to show whether the police found the guns at defendants' residences when they were looking for the specific items or the general items. Nevertheless, the dissent would exclude evidence only if it "could not have been seized" pursuant to the specific parts of the warrant. This is an unnecessary expansion of the severance rule adopted by several circuits, and could lead to what in effect would be a general warrant.
 
 
 77
 A plain view-severance approach is particularly inappropriate with indicia warrants. Indicia warrants by their nature are potentially subject to abuse. See p. 302, supra. Pretext can at times go undetected by a magistrate, and the possibility of an almost unlimited search may be too tempting for law enforcement officials. The effect of adopting a plain view-severance approach could be to uphold seizures pursuant to all but the most general indicia warrants. Therefore, we reject that approach in this case.
 
 IV. Joinder of the Conspiracy Count
 
 78
 Appellants argue they were irremediably prejudiced by the joinder at trial of the conspiracy count and the other charges. Most of the trial was devoted to the conspiracy count, with much of the evidence being conditionally admitted. The district court conditionally admitted the testimony of alleged co-conspirators pending the court's determination of whether a conspiracy was proved by a preponderance of the independent evidence. The district court eventually found that a conspiracy had not been shown, so it ordered the evidence stricken. The court dismissed the conspiracy counts at the close of the government's case. Appellants argue that the evidence as to the conspiracy dominated the trial and was extremely inflammatory and prejudicial, making the only proper remedy judgment of acquittal or dismissal on the non-conspiracy counts. Appellants moved for dismissal or judgment of acquittal at the close of the government's case, which we will assume arguendo was implicitly a motion for relief from prejudicial joinder pursuant to Fed.R.Crim.P. 14.
 
 
 79
 We do not think that the district court erred in refusing to order a new trial for appellants, much less in not ordering dismissal or judgment of acquittal. The conspiracy evidence was conditionally admitted pending production of independent evidence of a conspiracy. We explicitly approved such procedures in United States v. Bell, 573 F.2d 1040, 1044 (8th Cir.1978). Although the court could have required that the independent evidence of conspiracy be produced first, United States v. Macklin, 573 F.2d 1046, 1049 n. 3 (8th Cir.1978) it is in the district court's discretion to determine which procedure to use. Id. The district court's conclusion that the evidence from the conspiracy count was not irremediably prejudicial was reasonable from the perspective of this appeal. The conditionally admitted evidence went almost entirely to drug dealings, and the convictions for drug possession have not been appealed. No evidence was admitted on the most inflammatory part of the conspiracy charge--murder and torture--although the government did make a reference to this in its opening statement. An order for a mistrial is in the district court's discretion, United States v. Wade, 467 F.2d 1226, 1229 (8th Cir.1972), cert. denied, 410 U.S. 933, 93 S.Ct. 1384, 35 L.Ed.2d 596 (1973), as is an order for relief from prejudicial joinder under Fed.R.Crim.P. 14. United States v. Sanders, 563 F.2d 379, 384 (8th Cir.1977), cert. denied, 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 767 (1978). The district court did not abuse its discretion in believing cautionary instructions were adequate rather than ordering a mistrial, dismissal, or judgment of acquittal.
 
 V. Sufficiency of the Evidence
 
 80
 Appellants argue that the evidence was insufficient to sustain a conviction. Their primary argument is that evidence of constructive possession was inadequate when one considers that each appellant was not alone in the house where the guns were found and appellants' fingerprints were not on the guns. We find the evidence sufficient as to Apker, Davenport, and Gearhart.[15]
 
 
 81
 When we bear in mind the general standards, it is easy to see that the evidence is sufficient to sustain the verdicts against Apker, Davenport, and Gearhart. As we said in Durns v. United States, 562 F.2d 542 (8th Cir.), cert. denied, 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977):
 
 
 82
 On appellate review of the sufficiency of the evidence, the court must view the evidence in the light most favorable to the verdict rendered. It must accept as established any and all reasonable inferences from the evidence that tend to support the jury's verdict. The evidence need not "exclude every reasonable hypothesis except that of guilt[; it is enough] that it be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty."
 
 
 83
 Id. at 545-46 (citations omitted). A conviction for possession of a firearm by a felon can be based on constructive possession or joint possession. United States v. Polk, 574 F.2d 964, 965 (8th Cir.), cert. denied, 439 U.S. 849, 99 S.Ct. 150, 58 L.Ed.2d 151 (1978). Constructive possession can be established by a showing that the firearm was seized at the defendant's residence. Id.
 
 
 84
 As to Apker, he was arrested at a home he shared with Patricia Weeks and her twelve- and thirteen-year-old children. His Hells Angels colors were in the bedroom and the gun was found in a shaving kit in the bedroom. With his Hells Angels colors in the house and the fact that the gun was in a shaving kit, the jury could reasonably conclude that the gun was constructively possessed by Apker.
 
 
 85
 As to Davenport, three firearms were found at Mary Spethman's residence. A dog license in Davenport's name gave Spethman's house as his address. The weapons were in the bedroom, the only room with an unmade bed. One of the guns was found in a dresser drawer with Hells Angels T-shirts. The evidence is adequate to show possession by Davenport, especially with regard to the gun found with the T-shirts.
 
 
 86
 Davenport also complains about a comment made by the prosecutor in his summation relating to the evidence against Davenport. The prosecutor said there was no evidence that Mary Spethman was a member of the NRA [National Rifle Association]. We do not believe this statement was an improper comment on Davenport's failure to testify. It did not violate his right against self-incrimination or shift the burden of proof to the defendant because the comment did not refer to a matter about which only Davenport could testify. United States v. Hagar, 505 F.2d 737, 740 (8th Cir.1974). Furthermore, the district court ordered the jury to disregard the comment, and the court has broad discretion in dealing with closing arguments. United States v. Young, 618 F.2d 1281, 1289 (8th Cir.), cert. denied, 449 U.S. 844, 101 S.Ct. 126, 66 L.Ed.2d 52 (1980). We find no abuse of discretion here. As to Gearhart, he was arrested at a residence he shared with Tracy Nadrchal. Utility bills indicated he lived there. There were two guns under the mattress, two in a bedroom closet, two on top of a hutch in the bedroom, and seventeen inside a nailed-shut wooden crate in the living room. Again, a jury could reasonably conclude Gearhart possessed some or all of the weapons. The evidence is sufficient to sustain the convictions of Apker, Davenport, and Gearhart.
 
 VI. Conclusion
 
 87
 The indicia warrants in this case were too broad to meet the particularity requirement of the Fourth Amendment in light of the First Amendment associational interests involved. Nevertheless, the guns which were or may have been seized pursuant to the invalid indicia warrants are admissible against Apker, Davenport, and Gearhart because it was inevitable that the guns would have been discovered during the execution of the valid state search warrants. Therefore, the convictions of Apker, Davenport, and Gearhart are affirmed. There is no basis for not applying the exclusionary rule to the guns found at Fitzgerald's residence, so her conviction is reversed and her case remanded to the district court.
 
 
 88
 Affirmed in part; reversed in part.
 
 
 89
 BRIGHT, Circuit Judge, concurring in part and dissenting in part.
 
 
 90
 I concur in affirming the convictions of Apker, Davenport, and Gearhart, but would also affirm appellant Fitzgerald's conviction. In affirming, however, I would not adopt the "inevitable discovery rule" as grounds for curing the defective warrants. In the context of this case, where the federal warrants are only partially flawed, and where the nature of the flaw is a failure to comply with the particularity requirement, I would sever the valid portions of the warrants and suppress only those items which could not have been seized pursuant to a legitimate execution of the valid portions of the warrants.
 
 
 91
 As the majority finds on pages 302-303 of its opinion, the warrants described with sufficient specificity the jackets, belt buckles, T-shirts, photographs, plaques, and mirrors that were sought by the police. Continuing, the majority notes that "[i]f the warrants said no more they would be valid." The majority holds the warrants invalid, however, because the warrants also include items that are not described with sufficient particularity.
 
 
 92
 As an alternative to applying the inevitable discovery rule, I would apply the remedy of partial suppression, adopted most recently by the First Circuit in United States v. Riggs, 690 F.2d 298 (1st Cir.1982), a case that also involves items protected by the first amendment. In concluding that partial suppression remedied the warrant's flaws, the Riggs court noted the reasoning of Professor LaFave:
 
 
 93
 [I]t would be harsh medicine indeed if a warrant which was issued on probable cause and which did particularly describe certain items were to be invalidated in toto merely because the affiant and magistrate erred in seeking and permitting a search for other items as well.... It would be ironic, to say the least, if the efforts of the police to therefore "advise the court of everything which conceivably might be found in the premises" should result in the warrant being declared invalid in its entirety. [Id. at 300 (quoting 2 W. LaFave, Search and Seizure Sec. 4.6(f) at 111-12 (1978)).]
 
 
 94
 The Third, Fifth, and Ninth Circuits have also adopted the remedy of partial suppression. United States v. Christine, 687 F.2d 749 (3d Cir.1982); United States v. Cook, 657 F.2d 730 (5th Cir.1981); see United States v. Cardwell, 680 F.2d 75 (9th Cir.1982) (accepting partial suppression but finding no portion of the warrant sufficient to withstand the particularity and probable cause requirements).
 
 
 95
 A logical and just extension of that rule is to admit those items, such as the guns in this case, which could have been discovered in plain view pursuant to execution of the valid portions of the warrants. Indeed, if the warrants had authorized only a search for a jacket, and the guns had been found in plain view pursuant to a search for the jacket, a sufficient number of the guns discovered in this case would have been admissible to sustain the convictions.
 
 
 96
 That partial suppression does not weaken the particularity requirement is evidenced by the Ninth Circuit's holding in United States v. Cardwell, supra, 680 F.2d at 79. If no part of a warrant can be salvaged because no severable part refers to an item with specificity and probable cause, then all of the materials seized under the defective warrant must be suppressed. Id.
 
 
 97
 Nor does this approach invite abuse through use of warrants describing one thing for purposes of searching for another. The warrants must still meet the probable cause requirement. Moreover, the warrants must still be executed in a manner consistent with the authorization given the officers in the warrant.
 
 
 98
 The same protections cannot be assured in applying the inevitable discovery rule, which, in my opinion, invites standardless conjecture in hypothesizing whether or not police, during a routine police investigation, would inevitably have discovered the evidence.
 
 
 
 [1]
 The residence at which Davenport was found was apparently the woman's. There was some dispute as to whether the other residences were those of appellants or not. The evidence on this point is discussed at pages 303-304, 308-309, infra
 
 
 [2]
 Of the ten persons indicted, only six were tried because the other four remained at large
 
 
 [3]
 The Honorable Albert G. Schatz, United States District Judge, District of Nebraska
 
 
 [4]
 Of the other two defendants tried with appellants, one was charged only on one conspiracy count and the court dismissed that count. The other defendant was convicted only on a charge of simple possession of a controlled substance, was sentenced to one year, and apparently has not appealed. All defendants were given credit for the nine months they spent in jail pending trial. Appellants' sentences were stayed pending appeal
 
 
 [5]
 Appellants have not framed their issues precisely as we have, but we feel our statement of the issues makes for better understanding and analysis of appellants' arguments
 
 
 [6]
 The warrants authorized searches for "certain plaques, mirrors and other items which give the names of members of the Hells Angels." We do not see the words "plaques and mirrors" as significantly limiting the scope of the phrase "other items." No class of objects is readily apparent to us that would be defined by "plaques and mirrors," so as to limit the scope of the phrase "other items." Compare Andresen v. Md., 427 U.S. 463, 480-81, 96 S.Ct. 2737, 2748-49, 49 L.Ed.2d 627 (1976) (phrase "evidence of crime" refers only to evidence of the crime described in the warrant)
 
 
 [7]
 There is a sufficient nexus between the alleged illegal activity and the items to be seized. See pages 298-299, supra
 
 
 [8]
 Not all associations of individuals implicate the right of association. For instance, we can find no cases finding criminal conspiracies themselves within the realm of the freedom of association. Here, it is membership in the Hells Angels, not membership in the alleged conspiracy, that is arguably protected
 
 
 [9]
 United States v. Davis, 542 F.2d 743, 745 (8th Cir.), cert. denied, 429 U.S. 1004, 97 S.Ct. 537, 50 L.Ed.2d 616 (1976), which held that a warrant need not list the serial numbers of stolen currency, is consistent with the "as specific as possible" rule. In Davis, the serial numbers of only some of the stolen currency were known, so a listing of the serial numbers would not have limited the scope of the search. If all the serial numbers are known, they should be listed. United States v. Bright, 630 F.2d 804, 812 (5th Cir.1980)
 
 
 [10]
 We do not find that there was abuse in the instant case. See page 304, infra
 
 
 [11]
 Photographs could sometimes be the best evidence of indicia of membership. Among the items seized in this case were snapshots that might be called Hells Angels team pictures. They show ten men standing behind a Hells Angels banner which is being held up by two of the men
 
 
 [12]
 After the guns were found police told her to get dressed in the bathroom
 
 
 [13]
 This case would be controlling for the Eleventh Circuit as well, because the Eleventh Circuit follows the precedent of the old Fifth Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (1981)
 
 
 [14]
 Three guns were found in a bedroom at Fitzgerald's residence while the indicia warrant was being executed. A pistol was found in a woman's coat pocket in the closet. A rifle was behind a dresser and a shotgun was in the closet
 
 
 [15]
 We need not address the sufficiency of the evidence as to Fitzgerald; her conviction must be reversed because the guns found at her residence are not admissible